FIDELITY MUT. LIFE ASS'N OF PHILADELPHIA, PA., v. MILLER et al.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1899.)

No. 288.

1. LIFE INSURANCE—ACTION ON POLICY—EVIDENCE.

Where, in an action on a life insurance policy, defendant set up as a defense that the deceased obtained the policy, and deliberately committed suicide, for the purpose of defrauding the defendant, and in support of such defense introduced evidence of acts, conduct, and statements of deceased, including a letter written to a third person shortly before his death, not as acts or declarations against interest, but as showing his condition or state of mind, and the motives with which he acted, a letter written by the deceased to his wife on the day before his death was properly admitted on the part of plaintiff in rebuttal.

2. TRIAL—INSTRUCTIONS—EXPRESSING OPINION ON FACTS.

It is not error for a judge of a federal court, in submitting a question to a jury, to express an opinion as to the weight of certain evidence bearing thereon, where the jury are expressly told at the same time that the decision of the question rests entirely with them.

3. LIFE INSURANCE—MISREPRESENTATIONS IN APPLICATIONS—MATERIALITY.

Under a statute providing that a misrepresentation or an untrue statement made by an applicant for life insurance in good faith shall not work a forfeiture, or be ground of defense in a suit on the policy, unless the misrepresentation or untrue statement relates to a matter material to the risk, the insurer and insured cannot contract as to what statements shall be material, but that question is one to be judicially determined in each case,—by the court if the materiality is obvious, or by the jury if it depends on disputed facts.

4. SAME—CONSTRUCTION OF APPLICATION.

An application for life insurance required the applicant to state whether or not he had ever made application for insurance to any "company, association, or society," on which no policy had been issued, and to "give

name of each company, date of application, kind of policy, and amount applied for." *Held*, that an application for membership in a secret social and beneficial order, membership in which was attended with some benefit payable in case of death, was not within the language of such requirement.

**5. SAME—MATERIALITY OF REPRESENTATIONS.**

An applicant for life insurance stated, in answer to a question in the application, that he had never made application for insurance to any company, association, or society, on which a policy had not been issued. In an action on the policy after his death, it appeared that nine years before the issuance of the policy he had applied for membership in the Royal Arcanum, which was a secret social and beneficial order, in which some kind of benefit was paid on the death of a member, the nature and amount of which were not shown; that his application was reported on favorably by the examining physician, but rejected by the chief medical examiner on account of a fact shown by the examination, which in itself did not constitute good ground for rejection, which never affected the health of the applicant, and did not exist at the time of the issuance of the policy in suit. It further appeared that the deceased was never informed that he had been rejected on account of his health. *Held*, that the answer to the question in the application was made in good faith, and, if regarded as a misrepresentation, was immaterial to the risk.

**6. SAME—STATEMENTS AS TO SICKNESS AND DISEASES.**

Statements in an application for life insurance as to the diseases and sickness of the applicant are material, and he is bound in good faith to correctly state the facts so far as he knows them; but he is not bound to remember and state all of his ailments, and the temporary derangement of the functions of his organs, from which he recovered without impairment of his general health.

In Error to the Circuit Court of the United States for the District of Maryland.

This was an action by David P. Miller and Ann E. Percy, executors of William R. Percy, deceased, against the Fidelity Mutual Life Association of Philadelphia, Pa., on a policy of life insurance. There was judgment for plaintiffs on the verdict of a jury, and defendant brings error.

The defendants in error on the 27th day of December, 1897, brought their suit against the plaintiff in error on a policy of insurance insuring the life of William R. Percy for $25,000, payable to his legal representatives within 90 days after satisfactory proof of death, and of the just and lawful claim, both as to the rights and interest of the beneficiary thereunder, as well as to the justness of the claim. The application was attached to and made part of the policy. The policy was issued on the 5th of August, 1896. The death of the insured, W. R. Percy, occurred on the night of the 26th of May, 1897, by drowning in the Chesapeake & Ohio Canal, about 12 miles below Cumberland, Md., the horse upon which he was riding along the towpath suddenly plunging into the canal with him. The defendants in error were duly appointed executors of his last will and testament.

The suit was originally instituted in the circuit court of Allegany county, in the state of Maryland, but subsequently, on the 23d of March, 1898, on petition of the plaintiff in error, was removed into the circuit court of the United States for the district of Maryland. Ten pleas were filed by the plaintiff in error, and replication and issues followed in regular course of pleading. The defenses set up were: (1) False answers by insured as to his previous condition of health. (2) False answers as to the physicians whom he had consulted. (3) Concealment that he had been previously rejected by the Royal Arcanum. (4) That the policy was obtained by fraud, and that the application had been made with fraudulent intent at a time when he was hopelessly insolvent, indebted to trust estates, and unable to meet his indebtedness, and made for the purpose of protecting his benefi-

claries: when he had a deliberate purpose of taking his life, with the intent to liquidate his debts with money derived from the policies of insurance. (5) That the company, in any event, could only be liable for moneys paid to it as premiums, as he had died by his own hand within three years from the issue of the policy.

The clauses of the application for insurance, so far as material to the questions at issue, are as follows:

"(5) That I have never had or been afflicted with any sickness, disease, ailment, injury, or complaint, except as here stated. Nothing serious. A. B. Price, M. D.

"Give full particulars as to the nature thereof, date and duration, whether trivial or otherwise. If rheumatism, state whether muscular, sciatic, or inflammatory.

"Dyspepsia about twenty years ago. Ankle broken in 1847.

"(6) That the last physician I consulted, or who prescribed for me, was Dr. A. B. Price, of Frostburg, about Oct., '95, for the sickness here stated: Hurt from riding horseback; irritation of bladder; slight colic several times.

"Give nature and duration of illness, and, if complete recovery, say so.

"(7) That I have not consulted or been prescribed for by any other physician or medical man during the last ten years, except as here stated.

"Give date, nature of illness, and name of every physician for last ten years.

"None but John Porter, dead; after that, family doctor, A. B. Price.

"(8) That I have never made application for insurance on my life to any company, association, or society, upon which application no policy was or has yet been issued to or received by me for the full amount and kind, and at the rate applied for, and that no physician has ever given an unfavorable opinion upon my life with reference to life insurance, except as here stated. No.

"Give name of each company, date of application, kind of policy, and amount applied for.

   *    *    *    *    *    *    *    *    *    *    *    *

"I hereby agree and bind myself as follows: That the truthfulness of the statements above made or contained, by whomsoever written, are material to the risk, and are the sole basis of the contract with the said association. * * * And all provisions of law in conflict with or varying the terms of this agreement and policy applied for are hereby expressly waived. * * * And that, if any concealment or untrue statement or answer be made or contained therein, then the policy of insurance issued thereon, and this contract, shall be, ipso facto, null and void, and all moneys paid hereon shall be forfeited to said association: provided, always, that, if the necessary payments be made to keep said policy in force, it shall, in the event of my death, be incontestable for the sum payable thereunder after three years, except as therein set forth."

The defendants in error and the plaintiff in error respectively asked certain prayers or instructions of the court,—the defendants in error, six in number; and the plaintiff in error, five. The court granted the first, third, and sixth prayers of the defendants in error, amending, however, the first and sixth, and granted in lieu of the fourth a separate instruction of its own. It rejected the first, second, third, and fourth prayers of the plaintiff in error, and gave its fifth prayer, with an amendment by it, and treated the court's instruction granted in lieu of defendants in error's fourth instruction as one covering the second and third offered by plaintiff in error.

The instructions or prayers granted by the court are as follows:

"First [being the first prayer of defendant in error as amended]. If the jury find that the plaintiffs are the executors of the late William R. Percy, and that the defendant corporation executed the policy of insurance offered in evidence and delivered the same to said Percy in his lifetime, and that said Percy paid the defendant all premiums payable thereon at the time of said delivery, and paid all further premiums due thereon up to the time of his death, and complied with all the undertakings stipulated to be performed on his part in said policy, and that he died on the 26th day of May, 1897, and that the plaintiffs exhibited and delivered to the defendant the proofs of death

and justice of claim offered in evidence on or about the 21st day of June, 1897, and more than 90 days before this suit was brought, then the plaintiffs are entitled to recover in this suit, unless the jury shall find from the evidence that the application for the policy on the part of the said William R. Percy, deceased, contained some misrepresentation or untrue statement of fact made not in good faith by said applicant, or unless they shall find said application contained some misrepresentation or untrue statement or some material matter to the risk, or unless the jury find that said policy of insurance was obtained by said Percy from the defendant by fraud of him, said Percy, or that the said Percy destroyed himself. This prayer I grant, in connection with such other prayers as I shall grant, and such instructions as I shall give to the jury. The law of Maryland, passed in 1894, declares that a misrepresentation or untrue statement by an applicant for life insurance, made in good faith, shall not work a forfeiture, or be a ground of defense in a suit on a policy of life insurance, unless the misrepresentation or untrue statement relates to a matter material to the risk. This law renders it now impossible for the insurer and the insured any longer to agree that a statement shall be taken to be material to the risk, and to make it so, if in fact it is not really so, and prevents their contracting that a matter really irrelevant shall be taken to be material; and the plaintiffs' counsel contend that the court of appeals of Maryland, by its opinion in the case of this Same Defendant v. Ficklin, 74 Md. 172, 21 Atl. 680, and 23 Atl. 197, has decided that the question of materiality, as well as the question of good faith, is always to be left to the jury. However this may be, there are statements required in nearly all applications for life insurance which it would be the duty of the court, if requested, to instruct the jury are material to the risk, and as to which it would be the duty of the jury to act upon the instruction of the court. In my judgment, it amounts to this: that now, under the act of 1894, the untrue statement must relate to some matter material to the risk; and the materiality no longer depends upon the agreement of the parties that it shall be so considered, but upon the actual fact that it is so. If the materiality is obvious and legally indisputable, it is within the province of the court to instruct the jury that the statement is material; but if it is not obvious, or depends upon disputed facts, it is the duty of the court to have the jury decide whether it is material or not.

"Second [third prayer of defendants in error]. That the defendant has offered no legally sufficient evidence to sustain the seventh plea pleaded by it in this cause.

"Third [court's prayer in lieu of defendants in error's fourth]. The plaintiffs' fourth prayer has reference to the matter of the Royal Arcanum. All we know, from the evidence in this case, of the Royal Arcanum, is derived from the application made by Percy, and the witnesses who have spoken of it. It appears to be a secret order of a beneficial character, membership in which is attended with some benefit payable in case of death. I hold that, so far as the nature of this order appears, it is not within the terms of the eighth clause of the application to the defendant company. This ruling is supported by several decided cases. I refuse plaintiffs' fourth prayer, and give instead the following instruction: The jury are instructed that the evidence in this case does not justify them in finding that the statement made by Percy in the eighth clause of his application for the policy sued on had reference to the application by him dated August 12, 1897, for membership in the Frostburg Council of the Order of Royal Arcanum, given in evidence, and that in considering the truthfulness of the statement made by Percy in said eighth clause, so far as it relates to the applications for insurance on his life in any company, association, or society, the jury should disregard said application for membership in said order. There is another clause of that eighth section which has reference to an unfavorable opinion by a physician; and as to that I instruct the jury that the statement in said eighth clause, that no physician had ever given an unfavorable opinion on his life, with reference to life insurance, does not render the policy sued upon void, unless the jury find that said Percy knew of such unfavorable opinion, and, knowing it, concealed the fact by the said statement made by him in his said application to the defendant company.

"Fourth [sixth prayer of defendants in error as amended]. The plaintiffs pray the court to instruct the jury that mere temporary afflictions or ailments, not of a serious or dangerous character, which pass away, and are likely to be forgotten, because they leave no trace on the constitution, are not to be regarded as diseases, within the meaning of the application for the policy of insurance offered in evidence in this case. By the fifth clause of the application, Percy declared that he had never been afflicted with any disease, sickness, ailment, or complaint, except as stated, and, qualifying the statement in writing: 'Nothing serious; dyspepsia about 20 years ago; ankle broken in 1847,'—gave the name of his doctor, and also qualifying it by stating that (in the sixth clause) about 1895 Dr. Price prescribed for him for being hurt from riding horseback; irritation of the bladder; slight colic several times. I instruct the jury that the substantial correctness of his statements about his diseases and sickness was material to the risk, and he was obliged to state, in good faith, the facts, as far as he knew them, but that he was not obliged to remember and state all his slight illnesses, or temporary derangement of the functions of his organs, from which he had recovered without impairment of his general health. The statement was, in substance, that he had had no serious illness, and the burden is upon the defendant to satisfy you that the statement was false to a material extent. If, however, upon considering the whole evidence on the subject, you are satisfied that Percy, when he signed the application, knew that he had had a serious disease, of such character as to affect his general health, and by his statement concealed the fact from the defendant company, then the policy would be void.

"Fifth [plaintiff in error's fifth instruction as amended]. The jury are instructed that upon the policy of insurance, with copy of the application attached and made part of the contract as given in evidence, if the assured shall, within three years from the date of the policy, 'die by his own hand, sane or insane,' there can be no recovery by the estate of the dead man of the amount of insurance upon his life, except as to the money so paid into the company by the insured, which money in such event shall constitute the sum insured, and the defendant's liability under such policy; and the jury are further instructed that any form of self-destruction is covered by such description. The plaintiffs' second prayer asks me to say to the jury that upon the issue of suicide there is no legally sufficient evidence from which they can find that Percy committed suicide. I refuse this prayer, and leave the question of suicide to the jury. It is a matter with which a jury of twelve men is better able to deal than a single judge. Suicide is a matter generally incapable of direct proof, and as to which the jury are entitled to draw such reasonable inferences as the proven facts justify to the minds of men experienced in the affairs of life. I do say to the jury, however (leaving always entirely to them the decision of the question), that, so far as I remember the testimony, there is but little in the facts and circumstances of Percy's drowning which to my mind supports the theory of premeditated suicide by intentionally riding his horse into the canal. There is abundant testimony of his having recently taken an unusual amount of life insurance, and of the great disproportion between the annual premiums and the means of Percy to meet them; so that, if there is evidence to prove the suicide, there is abundance of testimony to suggest a motive. But the circumstances which tend to prove that Percy intentionally cast himself into the canal, or intentionally permitted himself to drown while in the canal, seem to me to be slight: but I leave this issue to the jury, with the following instructions for their guidance as to the amount of proof which they should have to justify them in finding that Percy destroyed his own life: The court instructs the jury that the presumption is that the death of the said insured, William R. Percy, was not voluntary, and the defendant, in order to sustain the issue of suicide on its part, must overcome this presumption by evidence sufficient to satisfy the jury that the death was voluntary. If the jury find that Percy drowned himself, or permitted himself to be drowned, then, by the terms of the policy, there can be no recovery of the amount insured; and on this issue I grant the defendant's fifth prayer."

On the 30th of June, 1898, after the evidence had all been adduced,—of which there was a great deal,—the instructions given by the court as above

set out, and the arguments of counsel, the case was submitted to the jury, and a verdict for $26,125 rendered in favor of the plaintiffs; and upon the same day a judgment was rendered thereon, to reverse which judgment the writ of error in this case was sued out.

J. W. S. Cochran and William Pinkney Whyte, for plaintiff in error.
Julian J. Alexander and B. A. Richmond, for defendants in error.

Before GOFF, Circuit Judge, and PAUL and WADDILL, District Judges.

WADDILL, District Judge (after stating the facts). The assignments of error are 11 in number, but it will not be necessary to take them up in detail. They are substantially covered by the following statements: That the court erred—First, in permitting a letter written by deceased to his wife, dated May 25, 1897, the day before his death, to be given in evidence by the defendants in error and read to the jury; second, in amending and qualifying the fifth instruction of the plaintiff in error in reference to suicide, whereby it is claimed that the court expressed to the jury an opinion upon the weight of evidence that resulted prejudicially to the plaintiff in error; third, in holding that the act of the general assembly of Maryland of 1894 was applicable to the policy sued on, and that under the law the insurer and the insured could not contract as to the materiality of statements in the contract of insurance; fourth, in deciding that the clause in the application for insurance as to the insured not having been rejected by any "company, association, or society" did not refer to his proposed application for membership in the Frostburg Council of the Royal Arcanum; fifth, in determining that the ailments or diseases covered by or referred to in the application for insurance were not merely temporary in character, but of a serious and permanent nature. This case depended mainly upon questions of fact, which, when fairly submitted to the jury, and by them determined, are conclusive. The verdict having been found for the defendants in error, it will be presumed that the cardinal facts were all found in their favor; and unless some error of law, either in the admission or exclusion of evidence, or the giving or rejection of instructions, contributed to that result, the judgment of the lower court should not be disturbed.

1. The question of the admission in evidence of the letter written by deceased to his wife depends largely upon the facts and circumstances of the case, and what took place pending the trial. The defense set up by the plaintiff in error was that the insurance policy had been obtained with intent to defraud the insurance company, by the insured deliberately taking his life, and that he did commit suicide. Upon this defense, issue was joined, and the jury was called upon to determine whether the deceased had deliberately taken his own life in furtherance of a contemplated scheme to defraud the company. In support of this defense a long chain of facts and circumstances, showing the conduct, manner, habits, appearance, and state of mind of deceased for some weeks before his death, what he did and said during this time and up to the hour of his death, were submitted to the jury by the plaintiff in error, with a view of showing that he did contemplate suicide. The plaintiff in error further offered in evidence

the contents of a letter (the original being destroyed) written by deceased to one Walter F. Coymer two or three days before he died, in which deceased directed Coymer to pay certain rent due him to his (deceased's) wife, at Frostburg, and that deceased had never done so before. This was also introduced with a view of showing that deceased was deliberately arranging for the fraud set up by the defense. In rebuttal of this, the defendants in error offered, and the court admitted in evidence, the letter which forms the basis of this exception, written by deceased to his wife, dated the day before his death, and mailed in the early morning of that day, which letter was duly received by his wife at Frostburg. We think that this letter, which was entirely inconsistent with the theory of contemplated suicide, was properly submitted to the jury. If it was not a part of the res gestæ, it was in rebuttal of evidence offered by plaintiff in error as to the conduct and demeanor of the deceased covering the very period of time involved. It would seem that the defendants in error should have been allowed to introduce evidence of the statements and actions of deceased during the very time that his conduct, actions, and behavior were called into question by the insurance company; and we therefore think that the letter is clearly admissible, under the circumstances. The evidence of the plaintiff in error as to what the deceased said and did was not introduced upon the theory of admissions against interest on the part of deceased, as it did not, in the main, prove or tend to prove anything of that character. It was, on the contrary, introduced with a view of showing the condition or state of mind of deceased at the time, and the motives with which he acted. Just what constitutes the res gestæ is sometimes difficult to determine. 1 Greenl. Ev. § 108. In Thomas' Adm'r v. Lewis, 89 Va. 1, 57, 15 S. E. 389,—a celebrated and leading case on the subject of gifts donatio mortis causa,—the contestants offered evidence of the donee's conversations had two or three days after the death of the donor, tending to show that she did not then claim or have in her mind the existence of the gift. The court, on the distinct ground that it was a part of the res gestæ, and in rebuttal of the evidence for contestants, permitted the donee to prove that she and her companion spoke of the fact of the gift, and of the declarations of the donor in her favor, to third persons, on the day of, and before, the death of the donor. Curtis v. Moore, 20 Md. 93; Lund v. Inhabitants of Tyngsborough, 9 Cush. 36; Rawson v. Haigh, 2 Bing. 104; Aveson v. Kinnard, 6 East, 188; Bateman v. Bailey, 5 Term R. 512.

2. The action of the court in commenting upon the evidence as to suicide in its amendment to the fifth prayer of plaintiff in error is free from error of a material character. In federal courts considerable latitude is given to the trial judge in passing upon questions of evidence, and he has the right to express his opinion. Improvement Co. v. Munson, 14 Wall. 449. He may direct a verdict as to him seems proper from the evidence, and necessarily must, in giving instructions, where the case is submitted to the jury, make some statement bearing upon the evidence, though, as far as possible, he should avoid making any comment upon the weight of evidence that would tend to influence the jury in reaching a conclusion thereon. In Lovejoy

v. U. S., 128 U. S. 173, 9 Sup. Ct. 58, Mr. Justice Gray, delivering the opinion of the court, said:

"It is established by repeated decisions that a court of the United States, in submitting a case to the jury, may, in its discretion, express its opinion upon the facts, and that such opinion is not reviewable on error, so long as no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury." Haines v. McLaughlin, 135 U. S. 584, 10 Sup. Ct. 876; Simmons v. U. S., 142 U. S. 155, 12 Sup. Ct. 171; Meyer v. Cadwalader, 60 U. S. App. 547, 32 C. C. A. 456, 89 Fed. 963.

The language of Mr. Justice Strong in the case of Evanston v. Gunn, 99 U. S. 660, 668, seems peculiarly appropriate to this case. He said:

"Sentences may, it is true, be extracted from the charge, which, if read apart from the connection, need qualification. But the qualifications were given in the context, and the jury could not possibly have been misled."

The words of the court in this case, "there is but little in the facts and circumstances of Percy's drowning which to my mind supports the theory of premeditated suicide by intentionally riding his horse into the canal," if standing alone, might possibly be objectionable, as indicating a purpose on its part to take from the jury the consideration of the question of suicide; but, when read in connection with what preceded and what followed, we feel sure that the jury could not have understood that the court meant to take from them the full consideration of the question of suicide. After granting the prayer of plaintiff in error on the question of suicide, the court added:

"The plaintiffs' second prayer asked me to say to the jury that upon the issue of suicide there was no legally sufficient evidence from which they can find that Percy committed suicide. I refuse this prayer, and leave the question of suicide to the jury. It is a matter with which a jury of twelve men is better able to deal than a single judge. Suicide is a matter generally incapable of direct proof, and as to which the jury are entitled to draw such reasonable inferences as the proven facts justify to the minds of men experienced in the affairs of life."

Then follows the language excepted to, quoted above, still further qualified as follows:

"I do say to the jury, however (leaving always entirely to them the decision of the question), that, so far as I remember the testimony, there is but little in the facts and circumstances of Percy's drowning which to my mind supports the theory of premeditated suicide."

Further in the same instruction the court said:

"But the circumstances which tend to prove that Percy intentionally cast himself into the canal, or intentionally permitted himself to drown while in the canal, seem to me to be slight; but I leave this issue to the jury."

Taking this charge to the jury as a whole, it is free from the objection of which plaintiff in error complains; and, from our view of the case, plaintiff in error was not prejudiced by the language of the court on the subject of suicide.

3. Did the trial court err in giving instruction No. 1 of defendants in error, as amended by it, and in holding that the act of the Maryland legislature of 1894 was applicable to the policy sued on? In considering this question it should be borne in mind that the contract of insurance was made in the state of Maryland, by a citizen of that state, with the plaintiff in error, a corporation of the state of Pennsylvania, duly

chartered by, and doing business under the laws of, that state. The law of the state of Maryland passed in 1894, above referred to, declares that a misrepresentation or an untrue statement by an applicant for life insurance, made in good faith, shall not work a forfeiture, or be a ground of defense in a suit on a policy of life insurance, unless the misrepresentation or untrue statement relates to a matter material to the risk. The law of the state of Pennsylvania (Act June 23, 1885; P. L. 134) is to the same effect. Plaintiff in error insists that the trial court erred in giving effect to the Maryland statute, because it only covered policies containing warranties, and that, notwithstanding these plain provisions of the statute, the insurer and the insured could contract as to the materiality of any statement made a part of the contract. We think the statute is clearly applicable to the policy sued on; that, whether in the application the word "warrant" is actually used or not, the language is sufficiently broad to constitute a warranty. May, Ins. § 156; White v. Society, 163 Mass. 108, 39 N. E. 771; Burlegh v. Insurance Co., 90 N. Y. 220. The supreme courts of the states of Maryland and Pennsylvania have each passed upon the effect of these statutes, and held that the "misrepresentation" or "untrue statement" contained in an application for insurance, and which is sought to be made a ground of defense, must be of some material matter, and that the parties cannot, in the face of the law, contract that immaterial matter shall be material, and that contracts of insurance must be made in subordination to the statutes, and can have the legal effect which the law attributes to them, and none other. We do not understand upon what principle of law insurance companies can claim a right to contract to disregard a plain provision of a statute made for their guidance. Insurance Co. v. Ficklin, 74 Md. 172, 185, 21 Atl. 680, and 23 Atl. 197; Hermany v. Association, 151 Pa. St. 17, 24, 24 Atl. 1064; Penn Mut. Life Ins. Co. v. Mechanics' Sav. Bank & Trust Co., 19 C. C. A. 286, 72 Fed. 418; Id., 43 U. S. App. 75, 19 C. C. A. 316, and 73 Fed. 653. The supreme court of the United States, in the case of Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87, recently had this general subject under review, and decided that under the law of the state of Iowa declaring that a solicitor for insurance should be considered the representative of the company, and not of the person taking the insurance, the parties could not contract to the contrary in order to make the solicitor the representative of the insured, regardless of anything contained in the policy. White v. Society, 163 Mass. 108, 39 N. E. 771; Levie v. Insurance Co., 163 Mass. 117, 39 N. E. 792; Hogan v. Insurance Co., 164 Mass. 448, 41 N. E. 663. It is manifest that these statutes were passed to prevent the defeat of the ends of justice by mere technicality. They are remedial in character, and should be given such liberal and reasonable interpretation as would insure a judicial investigation, in the ordinary way, of whether the particular statement alleged to be untrue or a misrepresentation was material to the risk. If the statement is found to be material, the penalty of forfeiture of the policy will follow, whether the answer be made in good faith or not. Should the question untruly answered relate to something found not to be material, and the answer be made in good faith, then the breach of warranty works no

prejudice to the insured or his representatives. We hold that there is no error in the first instruction of the lower court, and agree with the learned judge that the questions of materiality and good faith in the answers to questions propounded in the application for insurance are not always to be left to the consideration of the jury, but when such materiality is obvious, and the answers in the application are expressly made the basis of the contract, it is a matter for the court to pass upon. Otherwise, or when the materiality depends upon disputed facts, it should be determined by the jury. We have examined the two recent cases in the supreme court of Pennsylvania on this subject, to which our attention was called, of Lutz v. Insurance Co., 40 Atl. 1104, and March v. Insurance Co., Id. 1100, in which the act of the 23d of June, 1885 (P. L. 134), mentioned above, is further considered. We do not see anything in either of these decisions which changes or materially alters the doctrine laid down in the case of Hermany v. Association, 151 Pa. St. 17, 24 Atl. 1064, so far as affects this case. The views of that court coincide with those herein expressed upon the questions. of materiality of representation or statement,—as to when determined by the court, and when by the jury.

4. We will now consider the question of whether the application for certificate of membership in the Frostburg Council of the Royal Arcanum was within the scope of the questions and answers made thereto by the deceased in his application for insurance, copied in full in the statement of facts of the case. This subject was very fully discussed in the case of Penn Mut. Life Ins. Co. v. Mechanics' Sav. Bank & Trust Co., 19 C. C. A. 293, 72 Fed. 419. Judge Taft, speaking for the United States circuit court of appeals, Sixth circuit, said:

"The circuit court was right in holding that within the scope of the question: 'Have you your life insured in this or any other company? If so, give the name of each company, and the kind and amount of the policy,'—were not included Schardt's certificates of insurance in the Knights of Pythias and Royal Arcanum, mutual aid associations. It will be conceded that these associations, which are primarily for social and charitable purposes, and for securing efficient mutual aid among their members, are not usually described as insurance companies. That the certificate which they issue to a member, insuring, upon certain conditions, the payment of a sum certain to the member's representatives on his death, has much resemblance, in form, purpose, and effect, to an insurance policy, is true; and, if we were called upon to give the application a wide and liberal construction in favor of the insurance company, we might properly hold that the question embraced in its scope every association or individual contracting to pay money to one's representatives in the event of his death. Such a construction might be warranted by the probable purpose of the question to enable the company to judge how great a motive his life insurance would furnish the applicant for self-destruction or the fraudulent simulation of death. But we are here considering a contract and application drawn with great nicety by the insurance company, and framed with the sole purpose of eliciting from the insured full information of all the circumstances which the company's long experience has led it to believe to be valuable in calculating the risk. We cannot presume the company to have been ignorant of the fact that large numbers of persons have taken out life insurance in mutual benefit associations, which are not ordinarily described as insurance companies, and that doubt has often arisen whether the contracts they issue are properly or technically described as life insurance at all. Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87. Having in view the well-established rule that insurance contracts are to be construed against those who frame them (Indemnity Co. v. Dorgan, 16 U. S.

App. 290, 309, 7 C. C. A. 581, and 58 Fed. 945; Insurance Co. v. Crandal, 120 U. S. 527, 533, 7 Sup. Ct. 685), and that any doubt or ambiguity in them is to be resolved in favor of the insured, we conclude that a certificate in a mutual benefit and social society was not within the description, 'policy of life insurance in any other company.' We are fortified in the conclusion by the fact that this contract is a Pennsylvania contract, and the courts of that state have uniformly held that mutual aid associations and insurance companies are so clearly to be distinguished that statutes applying to insurance companies and their policies do not have application to mutual aid associations, and the certificates of life insurance which they issue to their members. In Dickinson v. A. O. U. W., 159 Pa. St. 258, 28 Atl. 293, the defendant association sought to avoid its certificate on the ground of misrepresentation in the application. The plaintiff objected to the introduction of the application, because it had not been attached to the policy in accordance with the Pennsylvania statute which forbade the introduction by an insurance company, in defense of a suit on its contract of insurance, of an application not attached to the policy when issued. It was held that the statute did not apply, because the defendant association was not an insurance company, but belonged to the distinctly recognized class of organizations known as 'benevolent associations.' See, also, Association v. Jones, 154 Pa. St. 99, 26 Atl. 253; Commonwealth v. Equitable Ben. Ass'n, 137 Pa. St. 412, 18 Atl. 1112; Commonwealth v. National Mut. Aid Ass'n, 94 Pa. St. 481; Lithgow v. Supreme Tent (Pa. Sup.) 30 Atl. 830; Theobald v. Supreme Lodge, 59 Mo. App. 87; Sparks v. Knight Templars, 1 Mo. App. Rep'r, 334. It is true that in other states it has been held that such associations are within the description of 'insurance companies,' and that the contracts they make are properly termed 'policies,' as those terms are used in the statutes of such states. State v. Nichols, 78 Iowa, 747, 41 N. W. 4; Insurance Order v. Lewis, 12 Lea, 136; Assurance Fund v. Allen, 106 Ind. 594, 7 N. E. 317; Com. v. Wetherbee, 105 Mass. 159; Sherman v. Com., 82 Ky. 102. In this conflict of authority, we must lean towards the decisions of the state courts of that state, according to the laws of which we must construe this contract, and, for the reasons already given, hold that certificates of membership in mutual benefit benevolent associations were not embraced in the question asked by the company in that state."

We have given this full extract from the opinion of Judge Taft because it treats this difficult and comparatively new question, in a case practically identical with the one under consideration, with much force, ability, and clearness; and we concur in his reasoning and conclusion as to what the law is, and adopt the same as applicable to this case.

It will be observed that the learned judge in the court below, in considering this question (court's instruction No. 4), was embarrassed by the lack of evidence as to the character of the Royal Arcanum Association. He said:

"It appears to be a secret order of a beneficial character, membership in which is attended with some benefit payable in case of death."

Can it be said from this description that the certificate of membership in this secret order came within the language used in the application for policy: "That I have never made application for insurance on my life to any company, association, or society"? "Give name of each company, date of application, kind of policy, and amount applied for." This last inquiry, read in connection with the first, shows clearly that it was a policy in some "company" about which information was sought, and that in the first inquiry the words "company, association, or society" all referred to one and the same thing, viz. to an insurance company; and, besides, while, in their broader sense and acceptation, the words "company, association, or society" may cover

a beneficial order, it will not be maintained that in ordinary life insurance parlance they mean any such thing. An "insurance company," an "insurance association," or "insurance society," all mean one and the same thing; that is, regular insurance. Hence, in the second inquiry, the name of each "company" was alone requested. The plaintiff in error itself is an insurance association, as distinguished from a company, and there are companies and societies in abundance; for instance, "The Equitable Life Assurance Society," "The New York Life Insurance Company," etc., all meaning the same thing. We do not feel that there can be any serious doubt as to the correctness of this conclusion,—particularly when, as we have shown, questions of doubt and ambiguity as to the meaning of the policy should be resolved against the company issuing the same. It was at least the duty of the plaintiff in error to show, in the court below, if it desired to bring the certificate of membership within the language used in the application for insurance in its company, what the insurance in the Royal Arcanum, if any, was. It does not appear in the record that the deceased ever applied for insurance therein, or for any policy therein, but merely for a "certificate of membership" in the order, which was a secret beneficial order; and in so far as there appears to have been any profits to be derived therefrom, as shown by the application for membership, it is in these words: "I direct that, in case of my decease, all benefit to which I may be entitled from the Royal Arcanum be paid Ann E. Percy." Nothing is shown as to what amount was to be received, or whether, as a matter of fact, the deceased would have been entitled at his death to any benefit arising from this secret social and beneficial order. The facts bearing upon the application for membership in the Royal Arcanum and the rejection of the applicant are meager in the record. The application for membership in the Royal Arcanum at Frostburg seems to have been made in July, 1887,—nearly nine years before the issuing of the policy sued on. The local medical examiner examined the deceased, and certified to his being a good risk, and that he would probably live out his estimated expectancy. Subsequently it seems that the application was rejected by the lodge, for what cause is not stated. At the trial of this case, however, the chief medical examiner of the order, from Boston, was examined as a witness for the plaintiff in error, who produced the original application for membership, taken from the archives of the order at Boston, with a pencil memorandum made thereon by the chief medical examiner at that time, as follows: "Rej. Aug. 20; Lt. Wt., High Sp. of U.,"—which means, as interpreted by the present chief medical examiner: "Rejected Aug. 20th; Light weight, too high specific gravity of urine." It does not appear that there was good reason for the rejection, and it is quite clear that the present medical examiner would not have made such rejection. It seems that deceased was 5 feet 6 inches in height, and weighed 119 pounds, at the time his application was sent in. The order's standard weight for a person of that height was 140 pounds, though they accepted risks as low as 116 pounds, 3 pounds less than the weight of deceased at that time. And, so far as the albumen in the urine was concerned, while it was 1038, and 1020 was normal, it was proved

that it was liable to change at any time; and there was nothing to show that the specific gravity at that time might not have been due entirely to some temporary cause, rather than from organic trouble. The matter of specific gravity of urine may or may not be an important element. If the result of organic disease, and progressive in its operation and effect, the materiality of its existence at one time would clearly appear as to any subsequent period in the progress of its operations upon the human system; but in this case it appears that a full medical examination was had before the policy in controversy was issued by the plaintiff in error, and the absence of symptoms which are claimed to have caused a rejection upon the examination for membership in the Royal Arcanum would clearly indicate the immateriality of both the question and answer as showing that the trouble, if any, was not organic, and had ceased to exist. The reason for the action thus taken by the order was never communicated to any one, and it is perfectly certain that deceased was never informed as to it; nor does it appear from the evidence that he was ever advised of his rejection as a member of the order. As to his rejection on account of health, the physician by whom he was examined certified his risk as being a good one, and it does not appear in the evidence in this case that he ever had any intimation to the contrary. Hence, whatever misstatements he may have made as to a physician not having reported unfavorably upon his application for life insurance, it was innocently made, so far as his application for membership in the Royal Arcanum was concerned. Moulor v. Insurance Co., 101 U. S. 708, 710. Further, it does not appear that any report was ever made adversely to him on an application for insurance of any kind. The fourth instruction therefore seems to us to be free from error. Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87; Commonwealth v. Equitable Ben. Ass'n, 137 Pa. St. 412, 18 Atl. 1112; Association v. Jones, 154 Pa. St. 99, 26 Atl. 253; Theobald v. Lodge, 59 Mo. App. 87.

5. The learned judge of the court below instructed the jury, in effect, that statements in the application of deceased as to his diseases and sickness were material, and that he was obliged, in good faith, to correctly state the facts so far as he knew them, but that he was not obliged to remember and state all of his slight ailments or temporary derangements of the functions of his organs, from which he had recovered without impairment of his general health, and that if, upon the whole evidence, they were satisfied that the insured, at the time he signed the application for insurance, had any disease serious in its character, likely to affect his general health, and failed to remember the same, then the policy would be avoided. We think this instruction correctly states the law. In the fifth clause of his application, the insured declared that he had never been afflicted with any disease, sickness, ailment, or complaint, except as stated, and qualified the statement by adding: "Nothing serious; dyspepsia about 20 years ago; ankle broken in 1847." He gave the name of his doctor, and also qualified it by stating in the sixth clause that about 1895 Dr. Price prescribed for him for being hurt while riding horseback; "irritation of the bladder; slight colic several times." This state-

ment by the insured of his health, and the temporary ailments and afflictions that he had, shows that the insurer and the insured each had in mind the inquiry after diseases serious in their character, and affecting the general health, and not merely temporary afflictions; and from the evidence it does not appear that the insured made any materially incorrect statement of any kind. These temporary ailments specified do not appear to have been serious in their character, and the insurance company was advised as to them before entering into the policy; and it nowhere appears from the evidence that the deceased was afflicted with a serious disease of any kind, or that he made misrepresentation or false statement as to his health in any respect. Authority in support of these views is abundant. Mr. Justice Harlan, in discussing the question of ailments in Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 258, 5 Sup. Ct. 119, 123, said:

"Unless he had an affection of the liver that amounted to disease (that is, of a character so well defined and marked as to materially derange for a time the functions of the organ), the answer, that he had never had a disease called 'affection of the liver,' was a 'fair and true' one; for such an answer involved neither fraud, misrepresentation, evasion, or concealment, and withheld no information as to his physical condition with which the company ought to have been made acquainted." Indemnity Co. v. Dorgan, 16 U. S. App. 290, 7 C. C. A. 581, and 58 Fed. 945; Insurance Co. v. Wise, 34 Md. 598; Insurance Co. v. Moore, 6 App. Cas. 648; Cushman v. Insurance Co., 70 N. Y. 76, 77; Society v. Winthrop, 85 Ill. 542; Brown v. Insurance Co., 65 Mich. 314, 315, 32 N. W. 610.

The assignments of error founded on the refusal of the court below to grant the instructions asked for by the plaintiff in error, referring to the questions we have discussed, and not covered by the instructions given, are without merit, for the reasons we have assigned in sustaining the instructions to the jury in the court below. The case seems to have been fully submitted, with a clear and comprehensive statement of the law, to which, as a whole, no just exception can be taken; and we find no error in the judgment of the lower court for which it should be reversed, and the same is affirmed.