Thomson, P. J.
On the 23d day of October, 1891, The Germania Life Insurance Company executed and delivered its policy of insurance to Jacob Boehm, whereby it promised to pay him $30j000 on the 23d day of' October, 1911, if he should then be living; or, in case of his death before that time, to pay the same amount to his executors, administrators or assigns. On the 11th day of November, 1891, Boehm assigned the policy to George E. Ross-Lewin, in trust for The First National Bank of Denver, to which institution Boehm was indebted in a sum exceeding the amount named in the policy. Boehm died on the 14th day of March, 1892, and the assignee brought this suit to recover the money payable by the terms of the policy. The defendant answered admitting all the allegations of the complaint; but, in avoidance, pleaded a condition *264 annexed to the policy to the effect thht if, within three years from the date of the policy, the insured should die by suicide, whether sane or insane at the time, the policy should be void; and averred that Boehm died by suicide. The judgment was in favor-of the company, and the plaintiff appealed.
About three of March, 1892, the dead body of Mr. Boehm was found on a bed in a room of the Windsor hotel in Denver. An ounce vial was discovered in his vest' pocket, labeled “Sol. Cyanide of Potassium,” and about half full of á liquid pronounced by physicians who examined it to be cyanide of potassium. On a stand in the room a glass or tumbler was found containing a few drops of the same preparation. It appeared in evidence that the preparation was compounded for Boehm and delivered to him on the 10th day of March, 1892, by a druggist whose name was on the label, upon a written prescription by a Dr. Meuer. Cyanide of potassium was shown at the trial to be a virulent poison, although sometimes prescribed by physicians as a medicine. According to the evidence, Boehm was in financial distress, and before his death was suffering from mental depression. The sole question for determination at the trial, was whether he committed suicide. There was no direct proof that he did, and whether he did or not, must be a deduction from circumstances. Upon the evidence admitted and the instructions given, the jury found that he did.
Error is assigned to the giving instructions, and to the admission of evidence. We think the instructions given correctly stated and applied the law governing the case, and substantially embraced all that the plaintiff asked, except a direction to return a verdict for the plaintiff for the amount claimed, the giving of which would have been *265 improper. Over the plaintiff’s objection the court allowed the testimony of a witness given in a former trial of the canse, and preserved by a hill of exceptions afterwards prepared, to he read to the jury, the witness having left the state, and being beyond the jurisdiction of the-court, without any showing that an effort had been made to procure his deposition; and also admitted evidence of declarations of .the deceased made after the assignment of the policy, and shortly before his death, from which an intention.to •commit suicide might, possibly, be inferred. We do not think the court erred in overruling, the .objection to the testimony of the absent witness. In Emerson v. Burnett, 11 Colo. App. 86, we held that .testimony given at a trial, in the presence of the court, and preserved as it "was given, was evidence, of as high an order as testimony given before an officer outside .of the court, and pnt into the.form of.a-deposition; and that it was not necessary, as,a,foundation for its introduction, to show that.the deposition of the witness was not obtainable. See also Brown v. Willoughby, 5 Colo. 1. It is true that im.a.case subsequently decided by this court (Magnes v. Nursery Co., 14 Colo. App. 219), the . learned judge who . framed the opinion, essayed to. confine the rule .to cases, where a witness had suddenly removed from the jurisdiction. At a former trial of the latter case the parties had stipulated that an old bill of exceptions might be used as evidence; and the question was whether the stipulation, as framed, was exhausted by the use of the bill at that trial, or whether it bound the parties in sxibsequent trials. Construing the stipulation, we held-that it was intended to be applicable to all trials; and that, therefore, the use of the bill was properly allowed at the particular trial which resulted in the judgment we then reviewed. This was the extent of the decision. Under that stipulation it was imma *266 terial whether the witness was within or without the jurisdiction; and the question of the competency of the hill of exceptions as evidence in the absence of the agreement, was not before us. The observations respecting the conditions upon which such evidence might be admissible, were wholly foreign to the question decided by the-court. They have, therefore, no binding force.
But what we have said does not dispose of the case. If the fact that Boehm deliberately and intentionally took his own life was established by competent evidence, the policy, by its terms, became void, and there could be no recovery, even by the assignee. It was contended that he did; and the sole question before us is whether certain evidence admitted by the court over the plaintiff’s objection, was properly received.
Adolph Schayer, a friend of Mr. Boehm, testified that a month or six weeks before the death of the latter, he was present at a conversation between Dr. Meuer and Mr. Boehm, in which the poisonous character of cyanide of potassium was discussed; that Mr. Boehm said to Dr. Meuer that he wanted some poison for the purpose of getting out of the way a favorite dog; and that. Dr. Meuer suggested cyanide of potassium, saying it would cause instantaneous and painless death. The witness also testified that on the day of Mr. Boehm’s death, about ten o’clock in the morning, the two took lunch together at the Arcade restaurant on Larimer street; that the latter displayed much anxiety and agitation; that he was wishing for half-past twelve o’clock to come, when an examination of his books in behalf of The First National Bank would be completed, so that he might know/'where he was at”; that in the midst of the meal he left the lunch table and telephoned to his partner at his'place of business; that on his return *267 from the telephone he asked to be excused, saying that he was in a hurry and must go to his store; that witness accompanied him to his store; that on the way, he told witness that his store had been attached by the bank, and asked witness to be as good a friend to his wife as he (witness) had been to him; that witness thereupon searched him, and suggested sending for his wife, but he said, “By no means send for her.” Earl B. Coe testified that he was Boehm’s attorney, and was, on the occasion testified to by Schayer, also at Boehm’s store; that he was.about to leave for Arizona, and that while in the store Boehm g-ave him a bottle of whiskey, saying: “It is something to think of me on your trip.”
Before proceeding to a discussion of this evidence, we think it would be well to notice a portion of the testimony of Dr. Meuer, one of the defendant’s witnesses, and of A. J. Ward, the druggist who filled the prescription of Dr. Meuer by compounding the preparation which was delivered to Boehm on the 10th of March, and who was also a witness for the defendant. Dr. Meuer said that he had been Boehm’s physician for about two years; that he had attended Boehm as his physician at his home in 1890; and that at other times Boehm had called at his (witness’s) office; that he had used cyanide of potassium as a medicine a good deal; that he had used it mainly for lung troubles; that it was also used for neuralgic troubles, and for diseases of the respiratory organs; but he said it was not a remedy, leaving an inference that the purpose of administering it was to give temporary relief only; that in October, or November, 3891, he gave Boehm a bottle of cyanide of potassium at the latter’s house; that he did the. same thing in January or February, 1892; and that he had given liim cyanide of potassium on several occasions. Mr. Ward said that retail druggists did not carry any *268 thing bnt chemically pure cyanide of potassium, and that they nsed it for medicinal purposes only.
The fact to be established was the death of Boehm, by suicide; and the burden of proving that fact was upon the insurance company. Merely discovering Boehm’s body in a room, together with evidence that he had been poisoned by cyanide of potassium, was not alone enough to establish the fact, especially in view of the testimony concerning the uses made of that drug, and its prescription for Boehm upon other occasions. From that testimony it appears that cyanide of potassium, although a deadly poison, is used by physicians as a medicine; and that Dr. Meuer, as Mr. Boehm’s physician, had frequently prepared and delivered it to him, previously to the last prescription. It is entirely süpposable that in his shattered condition, or being overtaken by some sudden ailment, Boehm took it, imagining that he might derive some benefit from it, and by mistake exceeded the safe amount. The presumptions- are against suicide; and if a death which may be explained on the theory of suicide, is also explainable on another theory which excludes the supposition of self-murder, in the absence of evidence to the contrary,' the law will adopt the latter hypothesis. It was to supply evidence to show suicide, and which the immediate circumstances did not furnish, that the testimony in question was introduced. On' the assumption'that the conduct and speeches of Boehm showed an intent to take his own life, it is argued that, being shortly1 afterwards followed by his death under circumstances consistent with the supposition of suicide, they were párt of the res gestae; and that the evidence was therefore properly received. The views of counsel are perhaps best expressed in their own phraseology. They say:
“The conversations with and' the statements *269 made by Jacob Boehm, prior to bis death,' were •offered in evidence for the purpose of showing his knowledge of the fatal properties of cyanide of potassium, the instrumentality which produced his death, and for the separate and distinct purpose of establishing, as an independent fact, his deliberate intention thus to take his own life.
“The motive was established by evidence that he was in desperate financial straits. His principal creditor, the bank, had been making an expert examination of his books and accounts. The hour had arrived when they had promised him an answer. On going to the telephone he learned that the bank had attached his property, and put the sheriff in possession. This was their answer. "Within a few moments he made the statement complained of, ‘Adolph, will you be as good a friend to my wife as you have been to me ? ’ which so alarmed his friend, Adolph Schayer, that he commenced to make a search of Mr. Boehm’s person, fearing that he would do violence to himself, and when Mr. Schayer, who evidently suspected the purport of these significant words, proposed to send for Mr. Boehm’s wife, he ejaculated, ‘By no means send for her,’ and within an hour, or an hour and a half, Mr. Boehm was dead. * * *
“All these expressions are explanatory of what followed; they harmonize with the main fact in the case, and explain its nature. The intent was present, and only awaited the earliest opportunity to carry it "into effect. His words were verbal acts, and all that he said and did, from the time he left the telephone ■until he drew the vial from his inside vest pocket, poured.it into a glass, and swallowed the contents, were but parts of one continuous transaction, and, therefore, upon principle, and in accord with the established rules of evidence, part of the res gestae
Assuming that the conduct and speeches of *270 Boehm evidenced an intention to commit suicide, counsel have cited some cases in which it is held that declarations of such intention, made within a short time previous to death, were properly admitted as showing mental condition, and as explanatory of the subsequent event. Some of the cases are not pertinent. In Smith v. N. B. Society, 123 N. Y. 85, Tyler procured insurance in a number of insurance companies, and the evidence showed that his design at the time he took out the policies was to defraud the companies by committing suicide, and thus secure money for his creditors and relatives. He had stated before the insurance was effected that, if he could not raise money, he would commit suicide. Under the terms of the policy suicide was not a defense to the action; but the court held that the fraudulent conduct was; that the fraud shown, having commenced with the application for insurance, and proceeded by successive steps to the ultimate result, was through all its stages, and from origin to culmination, a single transaction; and that the declarations proved were contemporaneous with the transaction, and, therefore, res gestae. In Fidelity Mut. Life Ass’n v. Miller, 92 Fed. 63, the only defense was that the deceased obtained the policy by fraud, with the deliberate purpose of protecting his beneficiaries by taking his life. Evidence having been introduced in support of this defense, consisting of a chain of facts and circumstances including a letter written by the deceased, the plaintiffs were allowed in rebuttal to introduce another letter written by him to his wife the day before his death; and the court held that it was properly received as being inconsistent with the theory of contemplated suicide. The case so far as this defense was concerned was similar to the one last cited; and the evidence produced by the defendants, which is not given, was probably admissible upo.n the *271 theory announced in the latter case. The letter to the wife was used only in rebuttal. We do not understand the case very well, but we understand it well enough to say that the decision has no bearing upon the question under consideration. But cases have been produced by which counsel’s contention seems to be sustained; among others, Travelers’ Ins. Co. v. Mosley, 8 Wall. 397; Commonwealth v. Trefethen, 157 Mass. 180. However, in a number of well-reasoned cases, the doctrine contended for is denied. —Seibert v. People, 143 Ill. 571; State v. Pusshon, 124 Mo. 448; Jenkins v. Pac. Mut. Life Ins. Co., 131 Cal. 121.
It is our opinion that neither the declaration nor conduct of Boehm after his assignment of the policy, was competent evidence against his assignee, unless they were part of the res gestae. Mental agitation in the presence of financial disaster is not unusual. It is very rare to find a person who can preserve a serene countenance while his fortune is being swept away; and to assume that excited conduct or speech under the influence of temporary distraction produced by misfortune, is, in itself, evidence of intention to commit suicide, would contradict experience. As a rule, after the first shock has passed, a feeling of hope, inherent in man, asserts itself; and the impulse is towards efforts to retrieve the loss. Cases of suicide caused by the pressure of adverse circumstances, are exceptional.
If the language attributed to Boehm may be interpreted as an expression of an intent to commit suicide, the spoken words were completely separated from the final act by lapse of time, and in our opinion were not part of the res gestae. It was upon this ground, giving the effect to the language for which counsel contend, that our original decision was based.
*272 But upon this'rehearing,' aided by able'and exhaustive arguments on both sides, oral and printed, we have carefully re-examined the ease; and, while our opinion remains unchanged, we find that the decision may be supported by other reasons which will not bring us into conflict with any adjudicated case.
In every instance, so far as our research has extended, where proof of previous utterances was allowed as explanatory of the ultimate fact, there was, in terms, a clearly expressed intention to commit suicide. The language used would bear no other interpretation. And, as it seems to us, if evidence of declarations, separated by a distinct interval .of time from the act by which life was terminated, may be properly allowed, so as to defeat property rights of a third person, vested before the words were spoken, they should be of such a character as unmistakably to indicate the suicidal purpose; But we find nothing in the words attributed to Boehm indicative of any certain intent. His remark upon handing the whiskey to Mr: Coe, that it was something to remember him by on the trip, is absolutely without meaning, except as expressive of good fellowship. His request that Schayer would be a good friend to his wife, and his refusal to have her sent for, possibly have some significance. They might be said to point to a contemplated enforced absence from his wife; and it is possible they were associated in his mind with the idea of suicide; but they were equally consistent with an intention to abscond. In relation to any purpose which he might have entertained at the time, the meaning of the language on its face, is uncertain and conjectural; but evidence which gives rise to nothing more than conjecture, should never be allowed to go to the jury, especially when the effect might be to imperil rights which had previously vested.
*273 And the evidence conld have hardly failed to, be injurious to the plaintiff. The fact that it was admitted by the court as bearing upon the question to be determined, together with its skillful association by counsel with the circumstances attending the death of Boehm, must have made a profound impression on the minds of the jury.
The judgment must be reversed.

Reversed.