No. 13,767.

F. M. BOYNTON vs. EQUITABLE LIFE ASSURANCE SOCIETY.

SYLLABUS.

In an action to recover the amount of a policy of insurance, the defense of suicide, to avail the company, must show that every reasonable hypothesis of accidental death is excluded by the evidence. The insured was alone and was found dead from a gunshot wound, which may have been accidentally inflicted.

On two occasions, the insured took opiates which caused him to be ill. This was some time prior to his death. It does not follow that they were taken with suicidal intent. They may have been taken to relieve pain. Those who attended the deceased in these illnesses did not seem at the time to have suspected that the drugs were taken with suicidal intent.

The jury of the vicinage, and the district judge who heard the testimony and witnessed the handling of a similar gun to the one the insured was handling at the time of his death, came to the conclusion that the plea of suicide was not sustained.

This court did not find ground sufficient to set aside the verdict and judgment

A PPEAL from the First Judicial District, Parish of Caddo—*Land, J.*

*Thomas Fletcher Bell* for Plaintiff, Appellee.

*Wise & Herndon* for Defendant, Appellant.

The opinion of the court was delivered by

BREAUX, J.   Plaintiff claims the amount of a policy issued by the defendant on May 24th, 1893, for five thousand dollars.   He was the beneficiary named in the policy.

Defendant's answer admits that the company issued the policy; denies that the premium had been paid, and sets up the plea of the intentional suicide of the insured.   Defendant has abandoned the plea of failure of the insured to pay the premium.

Between seven and eight o'clock on the morning of March 13th, 1894, A. Boynton, after having taken breakfast with his family, consisting of four children—a boy, aged sixteen; a girl, aged eighteen, and two others, aged eleven and five, respectively, and to whom he had talked pleasantly during the meal, left the breakfast table, at which his children were still seated, and went into another room of the house.   A few minutes after, a report of a gun was heard.   The eldest son was the first to enter the room and was closely followed by his eldest sister. The father was found sitting in a straight, high-backed, armless chair, leaning back.   He was not conscious.   He was taken from the chair and placed upon the bed in the room in which he was.   His daughter removed his shoes from his feet.   The son is not certain, but thinks he saw the gun, when he came into the room, lying across his father's leg, with the muzzle turned toward the right, in a direction opposite to that in which he was leaning.   The gun was a simple single-barrel, thirty-two-inch shotgun.   The thumb-catch of the hammer was broken.   The son had some time prior tied a string around the hammer, by which it could be cocked.   The father and the son had been in the habit of shooting rats with it around the house.   The son had left it loaded the previous day, but it was not his habit, after using it, to leave it loaded. The gun was a "trick gun," it seems, and required, as we understand it, some knowledge of its peculiarities to shoot it.

We are informed by the testimony that the deceased had not met with any severe misfortune in his immediate family, except the death of his wife about three years before, and that he was a kind father.   He was forty-seven years old and was in good health.   His only ailment at the time was that he had neuralgic headaches.

The defendant introduced testimony to prove that twice on former occasions, the insured had sought voluntary death. The first attempt, it was contended, was of a date some months previous to his death. He bought some morphine from a drug store near his home and said to the owner something about his going to use it to kill himself. On cross-examination, the witness, who is a merchant and sells medicines, changed and altered this part of his testimony, saying that the deceased said that this would about answer his purpose or about do the work. The witness added, "I had no idea, though, that he meant what he said."

On another occasion, he went to a boarding house in Shreveport and asked for a room to himself for the night, as he wished a quiet night's rest. He was heard groaning during the night and a physician was called in by the proprietress of the boarding house. The next day, she inquired of him how he was. He replied that he was feeling very well, and said, "Why did you send for a doctor? I wanted to die." His family troubles were more than he could bear, so he is reported to have said.

The testimony leads to the inference that his family troubles grew out of the conduct of his two brothers, who were, a few months before his death, charged with larceny, and were forced to leave the State to avoid a criminal prosecution. Upon evidence of which the foregoing is a summary, defendant seeks to have the judgment reversed.

The impression of the young son as to where the gun was when he entered the room, after hearing the fatal shot, we take as being correct. In our view, it does not necessarily follow that the deceased put an end to his own life intentionally. The son said that it was not usual to let the gun remain loaded, but that it was loaded the previous day after he had used it. The deceased may have taken it up not knowing that it was loaded and may have handled it as one sometimes handles an unloaded gun. There is nothing suggesting intentional suicide by one in taking up a gun. It may have been that he intended to use it for an entirely proper purpose. The freaks of a gun, when not carefully handled, are sometimes wonderful. We do not consider that the gun which deceased had, from the description of it, was entirely safe even when prudently handled. The string spoken of as tied around the broken hammer, is suggestive of danger when the gun was thoughtlessly taken up for any purpose. The theory of suicide is not the only one to be inferred from the testimony. Other conclusions may be arrived at equally as agreeable to reason.

Defendant contends that the suicidal intent was made evident, at least, twice not long prior to his death, as we have noted in the statement of the facts, once at his farm home and the next time in Shreveport. If we weigh his conduct indicating a desire to live, on the one hand, and the acts which defendant alleges were indicative of his desire to end his life on the other, the conclusion, we think, would be in favor of his desire to live.

This is not, it may be said, a correct test, for the reason that the least intent to take one's own life is of more moment and more serious than days and years passed without the least manifestation of suicidal intent. It is true, we know, that the desire to destroy one's self is hardly comparable with the desire to live, as made manifest by wish and intention. But. here these manifestations of an intent to commit the suicide are not established with any degree of certainty. At the time, so little was thought of them that no one seems to have suspected anything of the kind. It was only after death that they were recalled from the oblivion to which they had been relegated. These incidents were not testified to by the witnesses as if they had considered that he had intended to put an end to his life.

Turning to the other—the natural desire to live—there are a great many considerations which may be taken into account as rebutting entirely the incidents before stated. We are informed that he was an active and industrious man, kind and affectionate to his children, who, in return, felt the regard and affection due him. He was not annoyed by debt or anything else which would have a tendency to embitter one's life. This suit proves that he had at east one brother in addition to his children for whom he must have entertained regard. While, as a self-respecting man, he was doubtless greatly annoyed by the charges brought against two of his brothers, that was not, of itself, enough to drive a man to extreme desperation. Some time had elapsed since the charges had been brought against these two brothers, during which he did not refer to them as cause which was driving him to the commission of such an act as suicide.

We are of the opinion that our decree is amply sustained by the decisions in Leman vs. Life Insurance Co., 46 Ann. 1189, and in the case of Denechaud vs. Trisconi, 26 Ann. 404.

The evidence does not exclude the theory that the death was accidental.

For these reasons, the judgment is affirmed.