## MUTUAL LIFE INSURANCE COMPANY v. MARY C. FORD.

### Decided June 1, 1910.

**1.—Brief—Grouping Assignments.**

Assignments of error on different rulings which relate to the same subject may be grouped and submitted under a single proposition, but the practice is not commended.

**2.—Harmless Error—Overruling Exceptions.**

Error in overruling special exceptions is not ground for reversal where the trial was before the court and no evidence was admitted in support of the allegations excepted to.

**3.—Harmless Error—Absence of Findings.**

Error in overruling a special exception is not ground for reversal where, the trial being without a jury and no separate findings of law and fact made, it does not appear that the judgment was based on the matters excepted to, it being capable of support on other grounds.

**4.—Insurance—Application—Other Insurance.**

Insured in answer to a question in the application as to insurance in other "companies and associations" answered that he was insured in one named and in no others. He had also insurance in an accident company and in fraternal and local benefit societies, which was not disclosed. Held that the language of the question, being selected by the insurer who could have made his meaning clear, should be construed most strongly against him; that it was such as could be understood by insured as not including accident, fraternal or benefit insurance; and that the answer did not necessarily avoid the policy for misrepresentation by insured.

**5.—Insurance—Suicide.**

Evidence in suit on an insurance policy not covering death by suicide considered and held not to show conclusively that the death of insured by the discharge of an automatic "safety" pistol in his own hands, and which could only be fired by pulling the trigger, was by his own voluntary act, rather than by accident.

**6.—Insurance—Demand—Penalty for Refusal to Pay.**

The penalty, in damages and attorney's fees, imposed by article 3071, Revised Statutes, for failure of an insurance company to pay a policy, accrues only after demand. A formal demand for payment is not rendered unnecessary by the beneficiary submitting to the insurer proofs of death, nor by the insurer's refusal to pay the policy, nor by the suit brought on the policy and for the statutory penalties.

Error from the District Court of Hays County. Tried below before Hon. L. W. Moore.

Mr. Chief Justice Key being disqualified, Mr. J. M. Patterson sat in his stead by appointment as special Chief Justice.

*Jas. D. Crenshaw,* for plaintiff in error.—When a party deals with an agent and knows that such agent's authority is limited he is bound by such limitation. Nat. Guarantee, Loan & Trust Co. v. Thomas, 67 S. W., 454; Bank v. Insurance Co., 62 Texas, 466; Insurance Co. v. Mize, 34 S. W., 670; Cooley's Briefs on Insurance, vol. 1, pp. 347, 382; Insurance Co. v. Harris, 64 S. W., 871; Stringfellow v. Brazelton, 117 S. W., 205.

The statute requires that demand shall be made for the payment of the policy before the penalty can be assessed. Statutes of Texas, art. 3071; N. M. Life Insurance Co. v. Sturdevant, 59 S. W., 61.

The court erred in rendering judgment for plaintiff because the proof is clear and uncontradicted that Owen Ford, the insured, had breached his warranty in not disclosing the full amount of insurance on his life. Nat. Life Ins. Co. v. Reppond, 96 S. W., 778; Jeffries v. Economical Mutual Life Ins. Co., 89 U. S., 47; Cooley's Briefs, vol. 3, p. 2083; Aloe v. Mutual Reserve Fund Life Assn., 49 S. W., 557-8; Legion of Honor v. Lamour, 81 Texas, 75; Modern Order of Praetorians v. Hollmig 103 S. W., 475; McCollum v. Mutual Life Ins. Co., 8 N. Y. Supp., 249; March v. Metropolitan Ins. Co., 40 Atl., 1100; Insurance Co. v. Raddin, 120 U. S., 183; Moore v. Mutual Reserve Life Assn., 95 N. W., 573; Studwell v. Ben. Life Assn., 19 N. Y. Supp., 709.

The court erred in rendering judgment for plaintiff because the proof is clear and uncontradicted that the pistol with which the insured, Owen Ford, shot himself, could not have been fired by accident and could have been fired only by deceased. Parish v. Mutual Life Ins. Co., 49 S. W., 153; Mutual Life Ins. Co. v. Hayward, 34 S. W., 801; Merrett v. Preferred Masonic Life Ins. Co., 57 N. W., 169; Cooley's Briefs on Insurance, vol. 4, p. 3264; Agen v. Metropolitan Life Ins. Co., 80 N. W., 1020; Grand Lodge, W. O. W. v. Fletcher, 96 S. W., 742; Hassencamp v. Mutual Life Ins. Co., 120 Fed., 475.

*Will G. Barber,* for defendant in error.—It was permissible to allege and prove how insured, the insurer and its agent understood and construed the question asked Ford upon which the breach of warranty is assigned, and that the agent representing appellant knew of the relation of Ford to the orders. Equitable Co. v. Hazlewood, 75 Texas, 349; Phoenix Co. v. Coffman, 32 S. W. Rep., 813; Continental Co. v. Chamberlain, 132 U. S., 304.

The contract of insurance containing no provision making same void, and containing no provision forfeiting the premium to appellant upon breach of any preliminary warranty, and there being no allegation of actual fraud or intentional misrepresentation upon part of Ford, the contract was voidable only at appellant's option, and when advised of the facts constituting the alleged breach of such warranty it must have disaffirmed the contract within a reasonable time and returned the premium collected, or else it will be bound thereby. Selby v. Insurance Co., 67 Fed., 490; U. S. v. Clark, 83 N. E., 762; Modern Woodmen v. Vincent, 80 N. E., 427, 82 N. E., 475; Joyce on Insurance, vol. 2, secs. 1398, 1403-04; Fishbeck v. Insurance Co., 54 Cal., 422; Insurance Co. v. James (Tenn.), 18 S. W., 260; Williamsburg

Co. v. Cary, 83 Ill., 453; Schreiber v. Insurance Co. (Minn.), 45 N. W., 709; N. Y. Co. v. Baker, 83 Fed., 651; Gray v. National Assn., 11 N. E., 477.

An accident policy was not covered by the inquiry made of Ford in the application. Insurance Co. v. Parker, 96 Texas, 290; Mutual Co. v. Dobler, 137 Fed., 550.

The fraternal insurance orders of which Mr. Ford was a member were not insurance companies or associations, within the purview of the question asked him, nor was he insured therein as contemplated by such question. Fidelity Co. v. Miller, 92 Fed., 63; Penn Mutual Co. v. Bank, 72 Fed., 419; Newton v. Ins. Assn. (Iowa), 90 N. W., 75; White v. National Co., 30 Weekly Law Bul., 237 (Ohio); Penniston v. Union Central Co., 6 Ohio Dec., 830; Spitz v. Mut. Co., 25 N. Y. Supp., 473; Seidenspinner v. Ins. Co., 74 N. Y. Supp., 1108; Dineen v. General Co., 110 N. Y. Supp., 344; Insurance Co. v. Hazlewood, 75 Texas, 338; Commonwealth v. Assn., 137 Pa. St., 412; Dickinson v. A. O. U. W., 159 Pa. St., 258; Theobald v. Supreme Lodge, 59 Mo. App., 87.

The rule is that the burden of proof is upon the insurer to establish the defense of suicide, and the authorities require that it shall be made out quite clearly. Sov. Camp W. O. W. v. Boehme, 97 S. W., 848; Insurance Co. v. Bannister, 96 S. W., 742; Insurance Co. v. Liddell, 74 S. W., 87.

PATTERSON, CHIEF JUSTICE.—This is a suit by defendant in error against plaintiff in error on a life insurance policy issued October 15th, 1906, to Owen Ford, who died from a pistol wound on December 7th, 1906. Two special defenses are set up against recovery.

First. That the insured died by the act of his own hand in violation of the warranty in his application for the insurance that "I will not die by my own act, whether sane or insane, during the period of one year next following the date of issue of said policy."

Second. That the insured further stated in his application: "I am insured in other companies and associations as follows: $5,000 Equitable of New York and in no others," and warranted this statement to be true, when in fact it was not true, he having at that time the following certificates in fraternal assessment orders and local societies: Order of Pendoe, $1,225.00; Loyal Americans, $2,000.00; Friends in Need, $449.00; and Home Benefit Society of San Marcos, $254.00. Also that he, in addition to the fraternal and local society insurance, had an accident policy in the United States Casualty Company for $5,000.00. The case was tried before the court without a jury, and judgment rendered for defendant in error for the face of the policy, $2,000, with six percent interest thereon from January 31st, 1907, $240.00, as statutory damages, and $500.00 attorney's fees. The case is before this court on the record, without findings of law and fact by the trial court.

1. The first four assignments of error are grouped together and the group followed by one proposition and the proposition by one statement in the brief for plaintiff in error, and defendant in error objects

to our considering these assignments as in violation of Rule 30 for the Courts of Civil Appeals. The assignments complain of the trial court overruling four special exceptions to plaintiff's First Amended Supplemental Petition. It is permissible to group assignments which relate to the same subject, although not commendable; but when they are such as to permit grouping, each should be supported by its own proposition. Neal v. Galveston, H. & S. A. Ry. Co., 37 Texas Civ. App., 235, 83 S. W., 402. If there was error in overruling the special exceptions, it is harmless as the trial was before the court and the record does not show any testimony in support of the parts of the supplemental petition excepted to, and it is stated in the brief for defendant in error that the court refused to admit and hear evidence in support of the same. Houston & T. C. R. Co. v. O'Donnell, 90 S. W., 886; Turner v. Faubion, 36 Texas Civ. App., 314, 81 S. W., 810; Alexander v. McGaffey, 39 Texas Civ. App., 8, 88 S. W., 462; International & G. N. R. Co. v. Glover, 88 S. W., 515; Jackson v. Poteet, 89 S. W., 980.

2. The fifth assignment of error is that the court errer in overruling defendant's special exception to the fifth paragraph of plaintiff's First Amended Supplemental Petition wherein it is alleged in substance, that defendant did not give notice to the insured during his life, nor within any reasonable time after his death to the beneficiary, that it repudiated the contract of insurance and denied liability upon the ground of misrepresentations. The exception is that the matters alleged in said fifth paragraph "are no defense to any of the facts set up by the defendant as plaintiff alleges that she received a letter from defendant (which letter she is hereby notified to produce upon the trial of this case or secondary evidence of its contents will be introduced) in which this defendant denied liability on said policy in toto, and refused the payment thereof." An examination of the record shows that plaintiff only alleged in her First Amended Original Petition "that defendant, by its written communication of Jan. 31, 1907, declined and refused to pay said sum of $2,000.00 or any part thereof," but it is not alleged upon what ground defendant based its refusal to pay. We do not think it necessary to a proper decision of the case to pass upon the question whether the defendant was required to give notice to either the insured during his life or to his beneficiary after his death that it repudiated the contract for misrepresentations; and we would not feel warranted in reversing the case if we found it necessary to pass upon this question, as the case was tried by the court without a jury, and no findings of law and fact are in the record, it being the duty of this court in the absence of findings of law and fact by the trial court not to disturb the judgment if it can be based upon other pleadings and evidence in support of the same. Barton v. American National Bank, 8 Texas Civ. App., 224, 29 S. W., 210. If it was error to overrule the exception, it is abstract and harmless under the record before us. Gulf, C. & S. F. Ry. Co. v. John, 9 Texas Civ. App., 342, 29 S. W., 558.

3. The seventh assignment of error is that the court erred in rendering judgment for the defendant in error as the uncontradicted evidence shows that the insured did not disclose in his application the full

amount of insurance on his life at the time he applied for the policy here involved. The application was the printed form used by the company and furnished to its agents, and contained twenty printed questions and statements. Two of these question-statements, the 18th and 19th, and the answers thereto, are set out in the statement of facts, as follows: "18. I have been accepted for insurance under the following policies in this company: $1,000 Ten Pay. Income Policy." "19. I am insured in other companies and associations as follows: $5,000 Equitable of New York and in no others."

To the colon is the printed language of the Company and after it the applicant's statement written down by the agent of the Company, who testified that the meaning of the 19th statement was that the applicant was "not insured in any other insurance company."

The application is expressly made a part of the contract, and all statements and answers in it by the insured, as well as those made by him to the medical examiner, whether material or not, are made warranties.

While the rules for the construction of insurance contracts are simple and well settled, their application to the question here involved is not altogether satisfactory and the question itself does not seem to have been the subject of but very few decisions. The courts of almost every State have determined whether or not fraternal insurance orders and accident insurance companies are within the meaning of their respective insurance statutes and the cases are almost equally divided. They aid very little in solving the question whether fraternal and accident insurance are within the meaning of a statement like the one before us, as the decision in each instance depends almost entirely upon the wording of the statute and the legislative intent, and not upon what is commonly understood by the term "insurance." We think the question should be determined from the decisions that are free of statutory construction and by the rules applicable to insurance contracts. From these decisions we find the rule to be that if there is no room for the insured as a fair and intelligent person not to conclude from the question that fraternal and accident insurance were not intended to be included in his answer, then his failure to give the same vitiates the contract. On the other hand, if he could reasonably conclude that such insurance was not intended, then its omission does not render the contract void.

In Newton v. Southwestern Mut. Life Assn., 116 Iowa, 311, 90 N. W., 73, the question asked in the application was: "Has any company ever declined to grant insurance on your life?" The answer was "No." The court says: "The only evidence that this answer was false consisted in the answer by the assured to a similar question in an application for membership in the Sovereign Camp of the Woodmen of the World. The question was, 'Have you ever been rejected for life insurance? If so, state when, name the company or order.' The answer was, 'Yes, Modern Woodmen of America; one year ago.' It seems to be conceded that if this answer was correct, then it sufficiently appears that prior to the answer made in the application to the defendant association, the insured had been rejected on an application for membership in an insurance association known as the Modern

Woodmen of America. It is to be noticed, however, that the inquiry in the application to defendant was as to 'any company,' while the inquiry in the other case was whether the applicant had 'ever been rejected for life insurance,' and the inquiry further specifies, in 'any company or order.' Now, it may be that the insured did not regard the inquiry with reference to 'any company' as applying to insurance in a fraternal order. The insured himself seems to have made this distinction and we are of the opinion that he was justified in doing so. When an insurance company or association seeks to avoid a policy or certificate of membership on the ground of falsity of answer to a question which is by the terms of the contract made material, the court will construe the question and answer strictly as against the company and liberally with reference to the insured. Stewart v. Association, 110 Iowa, 529. If any construction can reasonably be put on the question and the answer such as will avoid a forfeiture of the policy on the ground of falsity of the answer, that construction will be given, and the policy will be sustained. . . . It would have been perfectly simple and easy to have asked the question in a broader form had it been desired that a comprehensive answer be given. When an applicant for insurance answers categorically the questions asked, and his answers are correct in any view of the question which can be reasonably taken, the insurance company or association, as the case may be, ought not to be allowed to escape its liability on the ground that the answers are false." And in Fidelity Mut. Life Assn. v. Miller, 92 Fed., 63, 34 C. C. A., 211, the statement in the application was: "I have never made application for insurance on my life to any company, association or society upon which application no policy was or has yet been issued to or received by me for the full amount and kind, and at the rate applied for, and that no physician has ever given any unfavorable opinion upon my life with reference to life insurance, except as herein stated. (Answer) 'No.' Give name of each company, date of application, kind of policy, and amount applied for." The insured had made application for a certificate of membership in the Frostburg Council of Royal Arcanum, a fraternal order. The court says: "This subject was very fully discussed in the case of Penn Mut. Ins. Co. v. Mechanic's Sav. Bank & Trust Co., 19 C. C. A., 293, 72 Fed., 419, Judge Taft, speaking for the United States Circuit Court of Appeals, said: 'The Circuit Court was right in holding that within the scope of the question: Have you your life insured in this or any other company? If so, give the name of each company, and the kind and amount of policy,' were not included in Schardt's certificate of membership in the Knights of Pythias and Royal Arcanum mutual aid associations. It will be conceded that these associations, which are primarily for social and charitable purposes, and for securing efficient mutual aid among their members are not easily described as insurance companies. That the certificate which they issue to a member, insuring, upon certain conditions, the payment of a sum certain to the member's representatives on his death has much resemblance in form, purpose and effect, to an insurance policy, is true, and, if we were called upon to give the application

a wide and liberal construction in favor of the insurance company, we might properly· hold that the question embraced in its scope every association or individual contracting to pay money to ones representatives in the event of his death. Such a construction may be warranted by the probable purpose of the question to enable the company to judge how great a motive his life insurance would furnish the applicant for self-destruction or to fraudulent simulation of death. But we are here construing a contract and application drawn with great nicety by the insurance company, and framed with the sole purpose of eliciting from the insured full information of the member, which the company's long experience has lead it to believe to be valuable in calculating the risk. We can not presume the company to have been ignorant of the fact that large numbers of persons have taken out life insurance in mutual beneficiary associations, which are not ordinarily described as insurance companies and that doubt has often arisen whether the contracts they issue are properly or technically described as life insurance at all. Continental Life Ins. Co. v. Chamberlain, 132 U. S., 304, 10 Sup. Ct. 87. Having in view the well established rule that insurance contracts are to be construed against those who frame them (Manufacturers' Acc. Indemnity Co. v. Dorgan, 16 U. S. App., 290, 309, 7 C. C. A., 581 and 58 Fed., 945; Accident Ins. Co. v. Crandal, 120 U. S., 527, 533, 7 Sup. Ct. 685), and that any doubt or ambiguity in them is to be resolved in favor of the insured, we conclude that a certificate in a mutual beneficiary or social society was not within the description, "Policy of life insurance in any other company." . . . Can it be said from this description that the certificate of membership in this secret order came within the language used in the application? "That I have never made application for insurance on my life in any company, association or society? Give name of each company, date of application, kind of policy and amount applied for." This last inquiry read in connection with the first shows clearly that it was a policy in some company about which information was sought, and that in the first inquiry the words "company, association or society" all referred to one and the same thing, viz., to an insurance company; and, besides, while in their broader sense and acceptation, the words "company, association or society" may cover a beneficiary order, it will not be maintained that in ordinary life insurance parlance they mean any such thing. An insurance company, an insurance association or insurance society all mean one and the same thing; this is regular insurance. Hence, in the second inquiry the name of each company was alone requested. The plaintiff in error itself is an insurance association, as distinguished from a company, and there are companies and societies in abundance; for instance, the Equitable Life Assurance Society, the New York Life Insurance Co., etc., all mean the same thing. We do not feel that there can be any serious doubt as to the correctness of this conclusion, particularly when, as we have shown, questions of doubt and ambiguity as to the meaning of the policy should be resolved against the company issuing the same." In Spitz v. Mutual Ben. Life Assn., 25 N. Y. Supp., 469, the court says: "Defendant's claim on the trial that, at the time of his application for membership, Spitz con-

cealed or suppressed certain material facts, was predicated of his
omission to state in answer to the following inquiry: 'What amounts
are now insured on your life and in what companies?' that he was
at that time a member of the American Legion of Honor and of the
Hillel Lodge of the Order of Free Sons of Israel, two benevolent
associations, whose membership was attended by the payment of a
mortuary benefit to the designated beneficiary of a deceased member.
. . . Neither of these omissions, however, can be considered a con-
cealment or suppression, under the rule which requires that the in-
quiry, being in the language of the insurer, must receive the interpre-
tation which is most favorable to the insured, (Dwight v. Insurance
Co., 103 N. Y., 341, 8 N. E., 654; Darrow v. Society, 116 N. Y.,
537, 22 N. E., 1093), and the further rule that, if the answer is true
and comprehensive in one proper sense of the inquiry, it can not be
successfully claimed by the insurer to be untrue or incomplete in an-
other sense, so as to work a forfeiture (2d Am. & Eng. Ency. Law,
page 296; Kenyon v. Association, 122 N. Y., 247, 25 N. E., 299).
In popular acceptation, benevolent associations, though perhaps in
some respects resembling them, are not regarded as the equivalent
of life insurance companies nor are mortuary benefits to the surviving
family of a deceased member in such associations commonly deemed
life insurance, in the sense in which the last mentioned phrase is
understood." In Seidenspinner v. Metropolitan Life Ins. Co., 74 N.
Y. Supp., 1108, the court says: "It is claimed by appellant that the
insured especially was untruthful in answering 'none' to the follow-
ing two questions 'State what amount of insurance you now carry on
your life, with name of company or association by whom granted, and
the year of issue,' and, 'is there any other insurance in force on
your life?' . . . It was very easy for the defendant, if it desired
it, to ask such questions as would clearly and fairly call upon the
applicant to disclose any membership in benefit and aid associations.
The language of the question which was asked and prepared by itself
is to be construed most strongly against it. The insured should not
be convicted of having made fraudulent and untruthful answers unless
such inference is fairly warranted by the evidence. If, as we think,
different inferences might be drawn as to whether the questions
stated called for different answers and information was given, then an
issue of fact was presented for a jury to pass upon."

In Mutual Rec. Life Ins. Co. v. Dobler, 137 Fed., 550, the ques-
tions and answers were: "Have you now any insurance on your life?
If so, where, when taken, for what amounts and what kinds of poli-
cies? A. $5,000 Washington Life. Combination bonds. May, 1900.
Have you any other insurance? A. None." The applicant had a
policy in an accident company. The court says: "In any view of
the case, we think that the most that can be claimed in behalf of the
plaintiff in error for the questions so propounded to the applicant was
that they were so worded as to leave it uncertain whether they called
for a disclosure of accident insurance which he carried at that time.
If the insurance company in its printed application employed ambigu-
ous terms or words of doubtful import, it can not complain if they
were construed as they were by the applicant, or if the agent so ad-

vised him of their meaning. The agent was appointed for the purpose of procuring applications and it is reasonable to assume that, in discharging his duties to the company it was within the scope of his power to construe for an applicant for insurance doubtful phrases, if any there were in the application." . . . In Continental Life Insurance Co. v. Chamberlain, 132 U. S., 304-311, 10 Supp. Ct. 87, 33 L. Ed., 341, the court said: "The purport of the word 'insurance' in the question, 'Has the said party any other insurance on his life?' is not so absolutely certain as in an action upon the policy to preclude proof as to what kind of insurance the contracting parties had in mind when that question was asked. Such proof does not necessarily contradict the written contract." In Thompson. v. Phoenix Ins. Co., 136 U. S., 287, 10 Supp. Ct., 1019, 34 L. Ed., 408, the court said: "If a policy is so drawn as to require interpretation and to be fairly susceptible of two different constructions, the one will be adopted that is most favorable to the insured. This rule, recognized in all of the authorities, is a just one, because those instruments are drawn by the company." To the same effect are the cases of Dineen v. General Acc. Ins. Co., 110 N. Y. Supp., 344; Lyon v. United Moderns, 148 Cal., 470; Equitable Ins. Co. v. Hazlewood, 75 Texas, 338, 7 L. R. A., 217, 16 Am. St., 893.

While there is some conflict in the cases as to whether a statement of the general character of the one under consideration should be held to cover insurance in fraternal orders and accident companies as well as insurance in regular insurance companies, yet we think that when all things are taken into consideration it is but reasonable and just to hold that an inquiry like the one in this case, in an application for insurance in a regular insurance company refers only to insurance in regular companies or at least an applicant would be reasonably justified in concluding that such was the case. The printed part of the eighteenth statement in the application is: "I have been accepted for insurance under the following policies in this Company." This is followed by the nineteenth, the printed part of which is: "I am insured in other companies and associations, as follows." The nineteenth inquiry when read in connection with the eighteenth is certainly sufficient to lead one to conclude that the information called for was life insurance evidenced by policies in regular insurance companies and not insurance evidenced by certificates in fraternal orders and by accident policies. It is true that certificates in fraternal orders and accident policies are insurance, in the broad sense of that term, but the courts have always recognized that there is a difference between a certificate in a fraternal or mutual benefit order, an accident policy and ordinary life insurance, based upon the inherent differences in the forms and kinds of insurance. 3 Am. & Eng. Ency. of Law, 990, 991, and notes; Supreme Conclave v. Cappella, 41 Fed., 1; Thomas v. Grand Lodge, 12 Wash., 500; Masonic Mutual Ben. Soc. v. Burkhart, 110 Ind., 189; Martin v. Stubbings, 126 Ill., 387, 9 Am. St., 620. The distinction is not only recognized by the courts but by insurance companies and the general public, and, as said in Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank, supra, "doubt has often arisen whether the contracts they (fraternal insurance orders) issue

are properly or technically described as insurance at all." It is a matter of common knowledge that old line insurance companies do not regard and treat fraternal and accident insurance as insurance, and that their agents in taking applications interpret inquiries similar to the one before us as not applying to any insurance except that in regular insurance companies. It is said in Continental Life Ins. Co. v. Chamberlain, 132 U. S., 304-311, "the purport of the word 'insurance' in the question, 'Has the said party any other insurance on his life?' is not so absolutely certain as, in an action upon the policy, to preclude the proof as to what kind of insurance the contracting parties had in mind when the question was answered." The inquiry being in the language of the company must be given the interpretation most favorable to the insured, and when the language is construed strictly against it in favor of the insured, its meaning is not absolutely certain. The minds of intelligent persons might reasonably differ as to whether fraternal and accident insurance were intended by the inquiry. The law does not favor forfeiture of any contract and if any reasonable interpretation can be given to avoid the forfeiture it will be adopted. It is reasonable to presume that insurance companies know the rules of construction applied by the courts in construing their contracts and questions in applications, and they should make all questions in the application plain and specific and not frame them so as to be of doubtful meaning. The fact that the courts have held that inquiries similar to the one in this case only applied to regular insurance is perhaps sufficient itself to justify us in saying that the applicant could have reasonably concluded that his answer was correct. Fidelity and Casualty Co. v. Loewenstein, 97 Fed., 17, 38 C. C. A., 29, 46 L. R. A., 450. The very nature of a life insurance contract demands absolute fairness and good faith on the part of each party to it. It is the duty of the insured to make true answers to all questions propounded to him by the insurer, and of the insurer to so frame the questions as to clearly and definitely indicate the exact information wanted and not leave what the answer should be in doubt. The object of the insured in taking out life insurance is to protect his family or those dependent upon him after his death, and the insurer guarantees to do this for a profit. In many of the cases in which the courts have been compelled to hold policies void for false statements, it is clear that the insured could have satisfactorily explained the same and saved the insurance, but the question was not raised until after his death, when no one was in position to disprove that the statement was not untrue from the standpoint of the insured at the time he made it. It is a matter of everyday experience and knowledge that insurance agents undertake to and do explain the meaning of the contract of their respective companies, and the meaning of the questions asked in the application. Almost every insurance agent can readily tell the meaning of his company's simple contract and plain questions in the application, when he is insisting that all his company wants is a chance to give protection to the loved ones of the insured after his death, but after the insured is dead no other contract is so complex as this simple one, and no other questions so ambiguous as these plain ones, and probably the construction of no

other instrument has more perplexed the courts and lawyers. It is not contended that the insured willfully made a false statement, and if the company is entitled to a forfeiture it is simply because of a technical warranty that can hardly be said to have been material to the risk and in justness to a strict enforcement by the courts. It is a hard rule that takes away from a man's family the insurance that he has paid for because he innocently made a misstatement in answer to a plain question, and it is not only hard but unjust to do so because a doubtful question could have been answered differently from what it was." As said in Dineen v. General Accident Ins. Co., 110 N. Y. Supp., 344, "An insurance company which is making every statement, whether material or otherwise, a warranty, must be held to a very strict rule when it is endeavoring to avoid payment on its insurance contract because of answers to inquiries or declarations which it has framed. They must be so plain and intelligible that any applicant can readily comprehend them. If any ambiguity exists, the construction will obtain most favorable to the insured." The reason assigned most generally for this rule is that the questions are framed by the insurer, that it is an easy matter to so word them as to directly call for specific information and leave no room for doubt; and that it is but fair when the language used is ambiguous to construe it strictly and strongly against the Company. We must think that the plaintiff in error knew when it framed the inquiries in its application blank and took Mr. Ford's application that fraternal, mutual home aid, and accident insurance was often, if not generally, treated by the public as not being included strictly within meaning of the term "insurance," and especially so when the idea is present that the insurance is evidenced by a "policy;" and that an inquiry like the one here might be interpreted by an applicant as applying to only insurance in regular companies. And we further think that as the company could have avoided all uncertainty by making it clear that it desired information as to fraternal and accident insurance it should not be allowed a broad construction in order to enable it to escape liability.

The eighth assignment of error is: "The court erred in rendering judgment for plaintiff becaus the proof is clear and uncontradicted that the pistol with which the insured, Owen Ford, shot himself, could not have been fired by accident and could have been fired only by deceased." In other words, that the evidence conclusively establishes that the insured intentionally shot himself. As the judgment of the trial court is against this contention, and, as said by Justice Brown in Grand Fraternity v. Melton, 102 Texas, 399, 117 S. W., 788, "must stand unless the evidence establishes that the shooting was intentional to that degree of conclusiveness which precludes a reasonable doubt to the contrary; that there must be no room for fair and reasonable minds to reach different conclusions from the evidence." This is the rule announced by our Supreme Court by which we must be governed, and it is our duty not to disturb the judgment of the trial court on this point, if there is room for fair and reasonable minds to reach a different conclusion from the evidence. The testimony in the record, on this issue, is in full as follows: Dr. J. R. De Steiguer testified: "I saw Owen Ford soon after his death. He was in the

street and lying in front of the postoffice and on the right hand side of the carriage. He was sitting or leaning against the negro who was holding him up with his feet down in the ditch between the carriage wheels and his head was drooping over against the negro who was holding him. There was a gun shot wound in the right temple just in the edge of the hair and a little above the ear ranging upward and backward. The bullet was on the left side of the head under the scalp probably two inches back of the ear. The bullet entered about one inch in front of the ear and ranged upward and backward. It was just daybreak when I saw him. I knew Mr. Ford before his death. He was a very large man, but I do not know that I would call him clumsy physically. He was about as active as most men of his size. He was crippled. I found in the carriage at the time a pistol and a walking cane. I did not see a lighted cigar in it, but it might have been there. His face was towards the carriage and his feet projecting under it. The negro was supporting him and he was dead at the time. Owen Ford would have weighed about 200 pounds or something over that." Tom Jackman testified: "The pistol I have here now (producing it) is the same that was found in the hack at the time Mr. Ford was killed. It is a 38 caliber, double acting Iver Johnson safety hammer pistol." Rufus Beard, the negro hack driver, testified: "I knew Mr. Ford and saw him at the time he died. I went down to his house after him about six a. m. and we got down town about ten minutes after six a. m. I went up to the curbing, as I usually did, for him to get out of the carriage and he got out of the carriage and said to me, 'I had better get my shooter,' and then turned back to get it and I looked at my horses and I heard the gun fire and I looked around and saw him sinking to the ground and I grabbed him and he was almost dead then. I called Mr. Gus Cook and told him that Mr. Ford had shot himself. He got out of the carriage on the side opposite the sidewalk with his hand on the door and said to me, 'I had better get my shooter, hadn't I?' and then he turned around and the next I saw of him he was in the act of reaching in to get his gun and I looked at the horses and about that time I heard the gun fire. He was sinking down astride of the step and was getting lower all of the time and I ran up and caught him and set him down. I had been driving Mr. Ford up to the postoffice every morning for the last six months. It was his custom to get out of the carriage on the side next to the sidewalk. He always got out on the same side, but this morning he got out on the opposite side. I saw him when he was getting out and the next time I saw him he was sinking down. I think it was about six months that I had been hauling him back and forth to and from the postoffice. Mr. Ford had gotten crippled. Before he was crippled he always used to walk and after that I hauled him. He had a trade with Mr. Berkley, the livery man, to haul him every morning. A week or two before he died I failed one morning to get him there, when I went for him he had gone himself, walking. It was pretty dark when this occurred that morning. I didn't notice anything unusual in Mr. Ford's manner that morning, except that he got out on the opposite side when I drove up to the postoffice. I had not seen him frequently get out on that side, but had once in a while.

The fact that he got out on that side did not attract my attention. As he got out of the carriage he did so with his face toward the carriage. There was a swinging door and a step to the carriage. Mr. Ford turned around. I think he had a stick in the carriage. There was a door to it that would swing back and forth. He said that he had better go back and get his shooter and then turned around as I supposed to get it. I do not know whether or not he was smoking that morning. I found his stick partly standing on the ground and leaning up against the carriage, it looked about like it had been hung on the edge of the carriage door. As he turned around the stick would have been just to his right. After he stated that he had better get his shooter he had his head and shoulders in the carriage. I had been very careful with Mr. Ford. I was much more careful with him than with any other man. 'Q. Now, as I understand you when he said that he had better get his shooter that was nothing unusual? A. No, sir.' While he was getting his gun I was watching the horses so that they would not start and probably hurt him, and just then I heard the gun fire and I looked around and at the same time saw him sinking down to the ground astride of the steps, the steps being between his legs. I don't know whether he got his body out of the carriage or not after he said, 'I had better get my shooter.' When he said that I turned around and was looking at the horses. The last I saw of him his body was in the carriage. The next thing I saw of him he was sinking down astride of the steps and I went and helped him up into a leaning position. He didn't speak or say anything just a little groan. Dr. De Steiguer came up in about twenty minutes and I was still holding the body. I did not look into the carriage until a match was struck and I found in the carriage Mr. Ford's hat and a cigar stump. That was a big, heavy walking stick which Mr. Ford had with a crook at one end. I think he left it on the carriage as he went into the carriage. It was about 24 or 25 inches from the seat of the carriage to a man's temple if he was standing in the door. It was about 44 inches from the bottom of the carriage. I thought at the time that I saw some powder burns just around the wound." R. L. Torkelson testified as follows: "I designed the safety feature of the Iver Johnson safety hammer revolver, also tools and fixtures for manufacturing the same. This revolver is called 'safety' because the trigger must be pulled back in order to place safety lever in position for firing the revolver. The combined safety lever and lifter in the Iver Johnson Safety Revolver has two functions, 'one to cock the hammer, and the other as a connecting piece between the hammer and firing pin. This lever is hinged on the trigger, and unless the trigger is pulled and held back against the rear end of the guard when the hammer falls, in the act of firing, there can be no connection between the hammer and the firing pin, as the hammer in falling will strike the solid breech of the frame only and the safety lever will be down and out of the way. This is what makes accidental discharge absolutely impossible, and shows that the trigger must be pulled and held back in firing position, in order to explode the cartridge. This safety feature is not found in any other arm. I am fifty years old. I have followed the manufacture of firearms for

thirty years in Worcester, Warring and Fitchburg, Mass., as designer, superintendent and manager. I am connected with the manufacture of the Iver Johnson revolver as designer. The only way to fire the Iver Johnson safety hammer revolver is to pull back the trigger as far as it will go, and hold it there while the hammer falls, otherwise the safety lever can not remain in firing position. The Iver Johnson Safety Hammer Revolver never did discharge accidentally. No other firearms but the Iver Johnson Safety Hammer Revolver has an absolute safety feature, but other guns are liable to discharge accidentally." R. E. McKie testified: "I have had considerable experience with firearms as I have owned a great many different kinds and have experimented considerable therewith. The pistol shown me, the one with which Owen Ford killed himself, is an Iver Johnson Safety Hammer Revolver. It is so called on account of the safety feature. The other pistol shown me now is the same kind of revolver. By removing the piece on the side of this revolver you can see the mechanism. By examining this you will see that there is no connection between the firing pin and the hammer, as the hammer rests solidly against the frame of the gun, and the way the cartridge is exploded is that the action of the trigger raises the safety bar up so that it makes a connection between the hammer and the firing pin, and the only way to fire the gun is to pull the trigger. Yes, I am something of a crank on firearms. I made some experiments with the pistol with which Mr. Ford was killed in the interest of the U. S. Casualty Co., I being in the employ of that company. The trigger of this gun would have to be pulled before it could be fired. The only advantage that it has over other guns is that the trigger must be pulled before it can be discharged. The hammer would have to be struck. I do not think that this gun would be likely to fire just the same as most any other gun if it would strike against anything. The firing pin of most any revolver will fire if it is struck against anything in the proper manner, but this one will not fire in that manner. I do not know whether this gun would be likely to fire just the same as most other revolvers if it should receive a jolt or jar. I never made any demonstrations in that way but I don't think it would. No, sir, I do not know whether or not this gun would fire by receiving a jolt. No, it would not fire by a jolt because this pin here has to be raised by the action of the trigger and the only way to explode it is to pull the trigger. I knew Mr. Ford, he was a cripple for several years. Yes, sir, I regarded him as a large clumsy man. Counsel for defendant produced some empty cartridges and witness took the empty cartridges and made some experiments with the gun in open court in the presence of the court, but could not explode the cap except by pulling the trigger. I saw the gun with which Mr. Ford was killed just after he died. Afterward I procured it from the sheriff, Mr. Jackman, and examined it. When I first saw it, it worked better than it does now, that is, it would not take so much pressure to pull the trigger as it does now. Some time after Mr. Ford's death I secured the pistol and tested it as to the trigger pull. I found it to be hard. I took a pair of scales that would pull twenty-five pounds and I found that it would take a little more than they would weigh to pull the trigger and place

the hammer in position to shoot. The experiment pistol pulls off at about 14 pounds and the Ford pistol takes about 25 pounds or more. The difference is that the experiment pistol is oiled up and cleaned and the Ford pistol is not. The Ford pistol is rustier than it was when I made my first experiment. I think it would then pull off at about 15 to 16 pounds with the cylinder closed. A pistol pulls off at a lighter pull at some places than it does at others. The difference in the two guns is that one had been oiled up and kept clean and the other had not. The Ford pistol is rustier now than it was when I made the first experiment. My statement is that at times the pull on it was from 14 to 15 pounds. That was with the gun open and, of course, with the cylinder in there would be added the weight of the cylinder. I think a man could pull twenty-five pounds with one finger." J. G. Borden testified: "I solicited Mr. Ford to take the insurance in question. I have had several years experience as an insurance man. I had been trying some little time to get Mr. Ford to take the insurance evidenced by the policy sued on before he finally took it. I solicited Mr. Ford very strongly to take the policy. At the time we wrote the policy or application I do not know that he read over the questions. Mr. Ford was a lawyer. My recollection is that the application was taken in the back of the postoffice. Mr. Ford was a very strong believer in insurance and said that if he was able he would take more insurance than he had. This is not a recent view with him as I had known about that and it was his belief all the time. He was a very strong believer in insurance. I base this statement on what he had said to me." Louis Hutchison testified as follows: "I had been accustomed to see Mr. Ford go down every morning. At the time it was rather dark. I went to where he was and looked inside the carriage. There was in the carriage the pistol, a cigar stump, his hat and cane. The cane was on the outside. The pistol was in the bottom of the carriage next to the back seat. Mr. Ford usually smoked and usually came down in a carriage." Ney Oldham testified: "I knew Mr. Ford at the time of his death, he was postmaster at San Marcos and I worked for him. I knew of his carrying a pistol. I knew from what he said as to why he carried it. He had had some trouble with one of his clerks named Marvin Williams. It was only a short time before he was killed that he had the trouble. The cause of the trouble was that this clerk was incompetent and Mr. Ford asked him to resign and that made him mad and he told Mr. Ford that if he was not crippled he would give him a whipping and Mr. Ford told him he need not stand back on that account. He came back three mornings and tried to raise a row with him and told me what he was going to do to Mr. Ford and all about that he was going to report him. I myself made him leave one morning. At the time of the first trouble when Williams told Mr. Ford that he was going to whip him there was only Mr. Ford, myself, and Mr. Ford's daughter, Miss Tony. At the time Mr. Ford was killed he had been carrying this pistol about ten days or two weeks. He told me why he was carrying it. He said that he was carrying the gun to protect his daughter; that for himself he did not care, but that he was going to carry it to protect her. Mr. Ford

would catch hold of a gun just like it was a package in the middle of anywhere he would happen to take hold of it. He had been carrying the pistol home with him and had usually been riding home. He was very badly crippled. He was subject to falling, and had fallen twice that same week. That occurred in the postoffice. He never did fall all the way down, he would start to fall and Miss Tony would catch him. As he would go to turn around that crippled leg would give away with him causing him to fall. At the time of his death I was on my way from home and when I got there he was dead. The pistol with which Mr. Ford was killed belonged to John Davis. I don't know whether John Davis put it in the back drawer and covered it with old papers. I know he gave it to Mr. Ford once to carry a while. Mr. Ford was accustomed to going to the back drawer and getting the pistol." Mrs. Mary C. Ford testified as follows: "I am the plaintiff in this case and live here in San Marcos. At the time of the death of my husband we had been married twenty-six years. We had five children, the oldest is 24 years old and the youngest 6 years old. My husband, Owen Ford, usually left for the postoffice about 6 o'clock in the morning, or whenever the carriage came for him. He would generally get up and have a cup of coffee. On the morning of his death, he got up, we had coffee and then we had our little family prayers, which we had every morning. He asked me if the train had come and I told him that I did not think so and then I heard it and told him that it was there, and then the carriage drove up and he went out and left. There was nothing unusual in his manner that morning. He was the same as he always was. He seemed contented and perfectly happy. My husband had not been accustomed to keep firearms about the place. He had a gun there but it was a double barrel shotgun which he had had for years. I do not know as to whether he was accustomed to carrying and the use of firearms. He was not a man who hunted. I never heard of his firing a gun. He was a husband who was attached to his family."

Can it be said that no other inference can be drawn from the evidence than that the insured fired the pistol with suicidal intent or that it procludes a reasonable doubt to the contrary? We think not. It is true that the evidence might be said to be conclusive that the pistol could only be fired by pulling the trigger; but this, in our opinion, is not sufficient to completely overcome either the presumption against selfdestruction or the presumption of accident. It is well settled that in the absence of satisfactory evidence as to the death being accidental or suicidal, the presumption is in favor of death by accident. Mutual Life Ins. Co. v. Whiswell, 56 Kan., 765, 44 Pac., 996; Travelers' Ins. Co. v. McConkey, 127 U. S., 661, 32 L. Ed., 308; Travelers' Ins. Co. v. Melick, 65 Fed., 178, 27 L. R. A. 629; Couadeau v. American Accident Co., 95 Ky., 280, 25 S. W., 6; Standard Life & Accident Ins. Co. v. Thornton, 100 Fed., 582, 49 L. R. A., 116; Home Benefit Association v. Sargent, 142 U. S., 691, 35 L. Ed., 1160; Cox v. Royal Life of Joseph, 42 Oregon, 365, 60 L. R. A., 620; Accident Ins. Co. v. Bennett, 90 Tenn., 256, 16 S. W., 723; Leman v. Manhattan Life Ins. Co., 46 La. Ann., 1189, 15 So. Rep., 388; Boynton v. Equitable Life Assurance Society, 105 La., 202, 29 So. Rep., 490,

52 L. R. A., 687. A reason is shown for the deceased having the pistol but not the slightest motive for suicide. The pistol could have been fired either intentionally or unintentionally by pulling the trigger. Under the evidence it is as reasonable to suppose that the trigger was unintentionally pulled as it was intentionally pulled. The fact that the pistol could only be fired by pulling the trigger does not show beyond a reasonable doubt that the insured intentionally fired it. To grant that the pistol could have been intentionally fired by pulling the trigger is but to admit that it could be accidentally fired in the same way. Every human action is subject to accident, and, as said in Boynton v. Equitable Life Assurance Society, 105 La., 202, 52 L. R. A., 687, "the freaks of a gun when not carefully handled are something wonderful." Fate wings with every human design the afflictive scythe of accident and often lays waste by unexplainable stroke the field of the most careful sower.

We are of the opinion that the trial court erred in giving plaintiff below judgment for twelve percent damages and attorney's fee. The penalty by way of damages and attorney's fee given by article 3071, Revised Statutes, 1895, for failure of an insurance company to pay within the time specified in the policy, when demand for payment has been made upon it, is strictly statutory, and in order for a party to be entitled to this statutory penalty he must allege and prove facts that bring him strictly within the provisions of the statute. The only proof of demand for payment by plaintiff in this case is that she made up and forwarded defendant proofs of death on the forms furnished her by it, that defendant, within a short time after it received the proofs of death, notified plaintiff that it would not pay the policy, and that she filed suit on the policy against defendant. The word "demand," in its verbal form, is the calling for a thing due or claimed to be due, a request made upon another to do a particular act under a claim of right on the part of the person requesting, and while formal words are not necessary to constitute a demand and any words which are understood by both parties to be a demand are sufficient, as a general rule, and filing of suit may operate in many instances as a demand, still we are of the opinion that the statute calls for an actual demand after the policy is due, and that the mere filing of a suit is not such a demand as is contemplated by statute. The evidence in this case fails to show that a demand for payment was made within the meaning of the statute, and the judgment for $240.00 damages and $500.00 attorney's fees is here set aside and rendered for the plaintiff in error. Lester v. Piedmont Life Ins. Co., 55 Ga., 475, 480; Northwestern Life Assurance Co. v. Sturdevant, 24 Texas Civ. App., 331, 59 S. W., 61; Iowa Life Ins. Co. v. Lewis, 187 U. S., 335, 47 L. Ed., 204; Security, Trust & Life Ins. Co. v. Halum, 32 Texas Civ. App., 134, 73 S. W., 554. We find no other error and the judgent for the policy for $2,000, with six percent interest from January 31st, 1907, is affirmed.

*Reformed and affirmed.*

Writ of error refused with written opinion. Mutual Life Ins. Co. v. Ford, and Ford v. Mutual Life Ins. Co., 103 Texas, 522.